

**New York State Office
of the Attorney General
Letitia James**

# *Nursing Home Response to COVID-19 Pandemic*

*January 2021*

# *Contents*

*Executive Summary* ................................................................................................5

*Timeline* ...........................................................................................................9

*Effect on Nursing Home Residents* ..............................................................10

   A. Facility-Reported Deaths ...........................................................................10

     1. A Larger Number of Nursing Home Residents Died from COVID-19
       Than Public DOH Data Reflected ...........................................................10

     2. High Numbers of Deaths at Nursing Homes During the Pandemic Exceeded
       Morgue Capacity and High Volumes of Deaths Citywide Exceeded Capacity
       of County Medical Examiners and Funeral Homes ..................................12

*Guidance Issued by Federal and State Governments* .................................13

*Methodology: Phase One Investigations, Hotline Reports, and Data Analysis* .................13

   A. Phase One Investigations of Nursing Homes Conducted by OAG
     During the First Wave of the Pandemic ....................................................14

   B. Attorney General James' COVID-19 Hotline ...........................................14

*Preliminary Findings from OAG Investigations and Data Analysis* ...........17

   A. Lack of Compliance with Infection Control Protocols Put Residents
     at Increased Risk of Harm During the COVID-19 Pandemic in Some Facilities .....................17

     1. Pre-Existing Infection Control Requirements for Nursing Homes ...............17

     2. Health Oversight Agencies Directed Nursing Homes to Strengthen
       Pre-Existing Infection Control Policies at the Onset of the COVID-19 Pandemic......18

     3. Examples of Preliminary Findings Regarding Infection Control Practices ...............19

       a. Failure to Isolate COVID-19 Residents Put Residents and Staff
         at Increased Risk of Harm...........................................................20

       b. Continued Communal Activities, including Communal Dining,
         Put Residents and Staff at Increased Risk of Harm ........................21

       c. Lax Employee Screening Put Residents and Staff at Increased Risk of Harm ...........21

       d. DOH Inspections Increased Facility Compliance
         with Infection Control Protocols......................................................21

# Contents

B. Nursing Homes with Low CMS Staffing Ratings had Higher COVID-19 Fatality Rates.........22

   1.  Preliminary Investigative Findings Regarding Low Staffing Levels ............................................24

   2. CMS Staffing Ratings Correlate More Strongly with COVID-19 Death Rates
     than CMS Overall Ratings ............................................................................................28

      a. The Majority of the COVID-19 Reported Nursing Home
        Deaths Occurred in CMS 1-Star and 2-Star Staffing Rated Homes..............................29

      b. Staffing Was More Determinative of Death Rates
        Than "COVID-19 Geography" During Initial Wave of the Pandemic ........................30

C. Lack of Sufficient PPE for Nursing Home Staff Put Residents at Increased Risk
   of Harm During the COVID-19 Pandemic in Some Facilities ....................................................31

D. Lack of COVID-19 Testing for Residents and Staff in Early Stages
   of the Pandemic Put Residents at Increased Risk of Harm in Many Facilities......................33

   1. Testing Requirements Helped Facilities Identify Residents and
     Staff Who Were Infected with COVID-19 .......................................................................35

   2. DOH Testing Protected Residents ............................................................................35

E. Lack of Nursing Home Compliance with Executive Order Requiring
   Communications with Family Members Caused Avoidable Pain and Distress ..................36

F. Government Issued Guidance May Have Led to an Increased Risk to Residents
   in Some Facilities and May Have Obscured the Data Available to Assess that Risk ............36

   1. At Least 4,000 Nursing Home Residents Died After the March 25
     Guidance on Admission Practices .............................................................................36

   2. DOH's March 21 Guidance on Testing Practices Obscured the Data........................38

G. Immunity Provisions May Have Allowed Facilities
   to Make Financially-Motivated Decisions.................................................................................38

H. Ongoing Investigative Work.....................................................................................................42

# Contents

**Regulatory Framework** ..........................................................................................43

   A. New York State Law on Nursing Home Requirements to Provide Care
     and Staffing to Meet Resident Needs .................................................... 43

   B. New York State Law on Nursing Home Duties to Residents ................................... 43

   C. Federal Law Relating to Nursing Homes..................................................... 44

     1. Federal Law for Nursing Homes Especially Pertinent to the COVID-19 Pandemic..................45

     2. 2019 Changes to Federal Nursing Home Regulations ..................................... 46

     3. CMS's 2019 Proposed Changes to Nursing Home Regulations ................................. 46

**Recommendations** .......................................................................................... 48

**Conclusion** .................................................................................................. 52

**Acknowledgments & MFCU Mission Statement** ..................................................... 52

**Appendix** .................................................................................................. 53

   Appendix A: Table of Key Federal and State Guidance ............................................. 53

   Appendix B: An Illustration of the Too Prevalent "Low Staffing for Profit" Model
            of Exploitation Through Insufficient Staffing, Lack of Transparency
            and Financial Incentives:  a Pre-Pandemic MFCU Investigation,
            Findings and Prosecution ........................................................... 63

# *Executive Summary*

This report is based on preliminary findings of the Office of Attorney General Letitia James (OAG)[1] from a review of information available through November 16, 2020. The report includes facts from the OAG's preliminary investigations of allegations of COVID-19-related neglect of nursing home residents across New York state and health data maintained as a matter of law by nursing homes and the New York State Department of Health (DOH).

In early March,[2] OAG received and began to investigate allegations of COVID-19-related neglect of residents in nursing homes. On April 23, OAG set up a hotline to receive complaints relating to communications by nursing homes with family members prohibited from in-person visits to nursing homes.[3] OAG received 774 complaints on the hotline through August 3 (an additional 179 complaints were received through November 16). OAG also continued to receive allegations of COVID-19-related neglect of residents through pre-existing reporting systems. During this time, OAG received complaints regarding nursing homes across the state, with a greater volume of complaints regarding nursing homes in geographic areas with higher rates of community-based transmission of COVID-19.

OAG is conducting ongoing investigations into more than 20 nursing homes across the state whose reported conduct during the first wave of the pandemic presented particular concern. Other law enforcement agencies also have ongoing investigations relating to nursing homes. Under normal circumstances, OAG would issue a report with findings and recommendations after its investigations and enforcement activities are completed. However, circumstances are far from normal. DOH data reports over 6,645 resident deaths as of November 16, with the vast majority (over 6,420) of those deaths occurring as of August 3. The COVID-19 health crisis is continuing and projected to worsen in the coming winter months. Infection rates are rising across the state, and across states nationwide, following increased travel and social gatherings over the holiday season. Inconsistent public compliance with face mask wearing, social distancing, and hand washing persists — despite orders and scientific guidance that shows these practices reduce the risk of COVID-19. Under these circumstances, nursing home residents remain especially vulnerable to transmission of COVID-19.

Attorney General James is issuing this report including findings based on data obtained in investigations conducted to date, recommendations that are based on those findings, related findings in pre-pandemic investigations of nursing homes in New York, and other available data and analysis thereof. Attorney General James offers this information to the public in the interest of increasing transparency and awareness and encouraging collective action by our state's residents to protect each other and our state's vulnerable nursing home residents. In addition, this information may be useful to other decision-makers for their consideration as they continue to respond to the ongoing pandemic.

## *OAG's preliminary findings are:*

» A larger number of nursing home residents died from COVID-19 than DOH data reflected.

» Lack of compliance with infection control protocols put residents at increased risk of harm during the COVID-19 pandemic in some facilities.

» Nursing homes that entered the pandemic with low U.S. Centers for Medicaid and Medicare Services (CMS) Staffing ratings[4] had higher COVID-19 fatality rates than facilities with higher CMS Staffing ratings.

» Insufficient personal protective equipment (PPE) for nursing home staff put residents at increased risk of harm during the COVID-19 pandemic in some facilities.

» Insufficient COVID-19 testing for residents and staff in the early stages of the pandemic put residents at increased risk of harm in some facilities.

» The current state reimbursement model for nursing homes gives a financial incentive to owners of for-profit nursing homes to transfer funds to related parties (ultimately increasing their own profit) instead of investing in higher levels of staffing and PPE.

» Lack of nursing home compliance with the executive order requiring communication with family members caused avoidable pain and distress; and,

» Government guidance requiring the admission of COVID-19 patients into nursing homes may have put residents at increased risk of harm in some facilities and may have obscured the data available to assess that risk.

To address the report's findings, a summary of recommendations follows below.

## *Recommendations:*

» Ensure public reporting by each nursing home as to the number of COVID-19 deaths of residents occurring at the facility — and those that occur during or after hospitalization of the residents — in a manner that avoids creating a double-counting of resident deaths at hospitals in reported state COVID-19 death statistics.

» Enforce, without exception, New York state law requiring nursing homes to provide adequate care and treatment of nursing home residents during times of emergency.

» Require nursing homes to comply with labor practices that prevent nursing homes from pressuring employees to work while they have COVID-19 infection or symptoms, while ensuring nursing homes obtain and provide adequate staffing levels to care for residents' needs.

» Require direct care and supervision staffing levels that (1) are expressed in ratios of residents to Registered Nurses, Licensed Practical Nurses, and Certified Nursing Assistants; (2) require calculation of sufficiency that includes adjustment based on average resident acuity; (3) are above the current level reflected at facilities with low CMS Staffing ratings; and, (4) are sufficient to care for the facility's residents' needs reflected in their care plans.

» Require additional and enforceable transparency in the operation of for-profit nursing homes, including financial transactions and financial relationships between nursing home operators and related parties, and relatives of all individual owners and officers of such entities with contractual or investor relationships with the nursing home. Through a variety of related party transactions and relationships, owners and investors of for-profit nursing homes can exert control over the facility's operations in a manner that extracts significant profit for them, while leaving the facility with insufficient staffing and resources to provide the care that residents deserve.

» Ensure that nursing homes invest sufficiently in effective training so staff can fully comply with infection control protocols. Hold operators accountable for failure to have clinically appropriate policies in place and to effectively train staff to comply with them.

» Support manufacturing of PPE to facilitate sufficient supply of PPE for purchase by nursing homes. Enforce requirements that nursing homes have sufficient inventory of PPE for all staff to be able to follow infection control protocols.

» Ensure that adequate COVID-19 testing is available to nursing home residents and employees and enforce requirements that nursing homes test residents and staff in accordance with DOH and the Centers for Disease Control and Prevention (CDC) evidence-based guidelines.

» Eliminate the recently enacted immunity provisions that can provide financial incentives to for-profit nursing home operators to put residents at risk of harm by refraining from investing public funds to obtain sufficient staffing to meet residents' care needs, to purchase sufficient PPE for staff, and to provide effective training to staff to comply with infection control protocols during pandemics and other public health emergencies.[5]

» Formally enact and continue to enforce regulatory requirements that nursing homes communicate with family members of residents promptly, but not later than within 24 hours of any confirmed or suspected COVID-19 infection and of any confirmed or suspected COVID-19 death.

» Increase staffing at DOH to ensure sufficient skilled resources for oversight, complaint assessment, surveys, inspections, and immediate responses to information requests from state agencies in support of health care and law enforcement efforts.

» Ensure that nursing homes engage in thoughtful planning regarding post-mortem care needs and implement and train staff on policies for dignified care of the remains of deceased residents.

» Urge families to consult the CMS Care Compare online database (medicare.gov/care-compare), ask questions of nursing homes relating to staffing, policies, procedures, and recent and current COVID-19 infections of staff and residents, and to obtain information relevant to their current or future long-term care decisions for their loved ones. Where possible, visit family member residents in person and through "window" visits and videocalls even if resident is unable to communicate, to provide emotional support and to enable observation of the resident's physical appearance and condition. Ensure family members know to report suspected neglect or abuse to DOH and OAG.

# *Timeline*

On January 31, the Secretary of the U.S. Department of Health and Human Services (HHS) declared a public health emergency for the United States to aid the nation's health care community in responding to COVID-19. The emergency declaration gave state, tribal, and local health departments more flexibility to request that HHS authorize them to temporarily reassign personnel to respond to COVID-19.[6] While everyone is at risk of getting COVID-19, older adults and people of any age who have serious underlying medical conditions are at higher risk for more severe illness. In early February, DOH issued specific correspondence to health care facilities in New York directing them to plan for COVID-19. In early March, travel-related cases and community contact transmissions of COVID-19 were documented in New York. On March 7, Governor Andrew Cuomo declared a COVID-19 Disaster Emergency, declaring that a "disaster is impending in New York State, for which the affected local governments are unable to respond adequately."

New York took the brunt of the initial wave of COVID-19 infections from March through May, as reflected in the high number of COVID-19 infections and deaths. As reported in numerous sources, the New York City metropolitan area received the bulk of travelers from Europe prior to federal closure of international airports. From March through August 3, DOH reported a total of 6,423 resident deaths in nursing homes due to COVID-19, including 3,640 confirmed COVID-19 deaths and 2,783 presumed[7] COVID-19 deaths.[8] These reported deaths are based on data reported by New York's 619 nursing homes to DOH through its Health Emergency Response Data System (HERDS). As reported by *The New York Times*, there were 422,296 COVID-19 infections and 32,422 COVID-19 deaths in New York state as of August 4:[9]

# Effect on Nursing Home Residents

## A. Facility-Reported Deaths

In New York state, the first wave of the COVID-19 pandemic impacted many of the residents and staff of the 304 nursing homes located within the nine downstate counties in the New York City metropolitan area.[10] Within these counties, according to DOH, there were 2,567 confirmed COVID-19 resident deaths and 2,687 presumed COVID-19 resident deaths, for a total of 5,254 resident deaths in nursing homes from March through August 3. Of the total 6,423 reported resident deaths in nursing homes statewide as of August 3, 81 percent occurred in facilities in these nine downstate counties. (Through November 16, reports total 6,645 resident deaths due to COVID-19.)

Western, Northern, and Central New York also experienced COVID-19 infections in nursing homes during this time. According to DOH, from March through August 3, nursing homes upstate reported 1,169 resident deaths, including 1,073 confirmed COVID-19 deaths and 96 presumed COVID-19 deaths. The state's peak of nursing home resident COVID-19 reported deaths occurred on April 8.[11]

### 1. A Larger Number of Nursing Home Residents Died from COVID-19 Than Public DOH Data Reflected

Preliminary data analysis obtained from OAG inquiries to a portion of nursing homes during the pandemic suggests that many residents died from COVID-19 in hospitals after being transferred from their nursing homes.

OAG asked 62 nursing homes for information about on-site and in-hospital deaths from COVID-19 for the week of March 1 to the date of the facility's response, which varied from the week of April 12 to July 19. This sample of facilities – approximately 10 percent of the number of nursing homes in New York – was not randomly selected. OAG investigation teams requested data regarding resident deaths during the course of its preliminary investigations.[12]

Using the data from these 62 nursing homes, OAG compared: (1) in-facility deaths reported to OAG to in-facility deaths publicized by DOH, and (2) total deaths reported to OAG to total deaths publicized by DOH.[13]

The first comparison raised some questions, as shown on the chart below:

### Deaths at Facilities – Comparison of Reports to OAG and DOH

| | |
|---|---|
| Facility Deaths Reported to OAG | 1,266 |
| Facility Deaths Publicized by DOH | 1,229 |
| Difference | (37) |
| Over/Under Percentage | -3.01% |

Although the calculated discrepancy of 3.01 percent may seem relatively low under the circumstances, closer analysis revealed that some facilities reported the location of the person at the time of death inconsistently. The discrepancies raise concerns because, when the data is removed for seven facilities that reported differing locations of death yet had a consistent <u>total death count</u>, the difference in reporting of deaths at the remaining 55 facilities jumps as publicized by DOH to **18.66 percent**. The DOH reporting system explicitly requires facilities to correct inaccurate reporting. Either such correction was not made by a number of facilities, or data were not reflected in DOH's published data for other reasons.

***Total Deaths Reported to OAG (incl. residents sent to hospitals) vs. Publicized by DOH***

| | |
|---|---|
| Facility Deaths Reported to OAG | 1,914 |
| Total Deaths Publicized by DOH | 1,229 |
| Difference | (685) |
| Over/Under Percentage | -55.74% |

The examples below illustrate that discrepancies remain even when the data reported to OAG is compared to data published by DOH as of later time periods through August 3:

» A facility reported 11 confirmed COVID-19 deaths at the facility, one suspected COVID-19 death at the facility, and four hospital deaths to DOH as of May 2020, and reported the same data to OAG. However, DOH published only one confirmed COVID-19 death at the facility until July 31, when its publication reflected eleven confirmed in-facility deaths -- a discrepancy of five deaths from what was reported to DOH by the facility. [14]

» A facility reported one confirmed and six presumed COVID-19 deaths at the facility as of August 3 to DOH. However, the facility reported to OAG a total of 31 COVID-19 suspected deaths at the facility as of April 18 – a discrepancy of 25 deaths.

» A facility reported five confirmed and six presumed COVID-19 deaths at the facility as of August 3 to DOH. However, the facility reported to OAG a total of 27 COVID-19 deaths at the facility and 13 hospital deaths – a discrepancy of 29 deaths.

Applying the data that these 62 nursing homes reported to OAG, which includes resident deaths occurring in the facility and in the hospital after transfer, shows a significantly higher number of resident COVID-19 deaths can be identified than is reflected in the deaths publicized by DOH.

OAG is investigating those circumstances where the discrepancies cannot reasonably be accounted for by error or the difference in the question posed.

In conclusion, this preliminary data for the 62 facilities and time periods noted above suggests that COVID-19 resident deaths associated with nursing homes in New York state appear to be undercounted by DOH by approximately 50 percent. [15]

## 2. High Numbers of Deaths at Nursing Homes During the Pandemic Exceeded Morgue Capacity and High Volumes of Deaths Citywide Exceeded Capacity of County Medical Examiners and Funeral Homes

OAG preliminary investigations indicate that in April, six New York City nursing homes experienced resident death numbers that exceeded the facilities' onsite morgue capacity. In each of those instances, the facility appropriately contacted funeral homes or the medical examiner's office. However, the high numbers of COVID-19 deaths across New York City had filled the capacity of local medical examiners and funeral homes. As a result, there were times when several days passed before remains could be transported out of the facilities.[16] Media reports in New York City during the peak of the first wave of the pandemic contained allegations that bodies of deceased residents were "piling up"[17][18] inside a number of nursing homes. OAG investigated these allegations.

OAG determined that the allegations were unfounded with respect to two of the six nursing homes. In three for-profit facilities, OAG determined that the remains awaiting transfer were stored in accordance with accepted industry practice, which is to place the bodies in unoccupied patient rooms with the air conditioning on full power and with doors sealed. In an investigation of one not-for-profit facility, OAG determined that deceased residents' bodies awaiting transfer were appropriately stored in rented refrigerated trucks in the parking lot of the facility.

Under the circumstances, the preliminary investigations indicate no violation of law or industry practice in the storage of the remains of deceased residents. These incidents raise the question of whether the facilities engaged in enough planning. Relatedly, some staff conveyed surprise and shock at the discovery of onsite storage of remains other than in the morgue, indicating internal communication and training lapses.

## Guidance Issued by Federal and State Governments

Federal and state agencies issued and updated guidance from January to May as evidence and knowledge about COVID-19 developed. During the pandemic, Governor Cuomo issued many executive orders in an effort to flatten the rising curves of COVID-19 infection and death rates, including directing New York to be "On Pause," and requiring the public to wear masks and practice social distancing. In addition, CDC, CMS, and DOH issued guidance relative to COVID-19. As the virus spread through New York and other states and countries, more information was promulgated about COVID-19 infection, illness, and treatment, prompting federal and state health agencies to issue updated guidance. Much of this information contained reminders and updates about best practices for containment and control of respiratory viruses – a disease vector well understood in health care facilities. This guidance also reflected updates on evolving medical knowledge about COVID-19.

A chronology of key guidance and directives issued by CDC, CMS, DOH, and Governor Cuomo that relates to nursing homes appears in the table in Appendix A.

* * *

With these health care directives as background, OAG conducted the investigations described in the following sections.

## Methodology: Phase One Investigations, Hotline Reports, and Data Analysis

OAG used three investigative approaches for this report. First, OAG opened a hotline to receive reports of violations of executive orders concerning communications with families, which expanded to receive reports of abuse and neglect. Second, OAG analyzed data from CMS and DOH for correlations between COVID-19 outcomes and CMS facility ratings. Third, OAG followed up on direct or media reports of potential abuse or neglect due to COVID-19. OAG conducted preliminary, or phase one, investigations of many nursing homes, and has continued and expanded investigations with respect to a number of them.

Except where noted, this preliminary report excludes information from enforcement investigations, and, where such information is set out, portions were redacted or paraphrased to protect the investigation or privacy of individuals not accused of wrongdoing. Names of individuals or business entities have been redacted, unless the person was convicted of criminal conduct or named in public filings such as settlement agreements or Assurances of Discontinuance under Executive Law § 63(12).

## A. Phase One Investigations of Nursing Homes Conducted by OAG During the First Wave of the Pandemic

Based on allegations of COVID-19 related neglect received as of August 9, OAG conducted phase one investigations into 174 nursing homes statewide. Preliminary findings in this report are based on information obtained in the investigations, and the other data referenced herein. The data obtained during these investigations includes interviews conducted by telephone, documents obtained from nursing homes and third parties, and surveillance conducted. These complaints and investigations included facilities everywhere in the state. Based on the preliminary investigations, OAG is continuing investigations of over 20 facilities in greater depth.

 Upon receipt of these allegations, OAG investigative teams followed up with complainants and promptly contacted the nursing home in question to determine whether substandard infection prevention and control practices existed at the reported home that could endanger residents, or if critically low staffing existed to the same effect. In the vast majority of these instances, the subject nursing homes cooperated fully. The primary goal of the initial inquiries was to determine whether, among other things, each facility reported having PPE and proper infection control protocols in place, and whether, based on the staffing and other conditions reported, the residents appeared to be in danger. If OAG concluded that alleged circumstances at a facility presented likely and significant risks of harm to the residents, OAG referred those facilities to DOH for immediate action. DOH responded to such facilities, including with onsite teams. A DOH referral does not mean that OAG closed its own investigation.

## B.  Attorney General James' COVID-19 Hotline

OAG opened a dedicated internet and telephone hotline on April 23, to address public and inter-agency concerns about a lack of prompt and effective compliance with Executive Orders 202.18 (April 16) and 202.19 (April 17) concerning communications with family members. The executive orders require nursing homes and assisted living facilities to notify "family members or next of kin of residents" within 24 hours when a resident of the facility either tests positive for COVID-19 or suffers a COVID-19-related death.

Earlier DOH guidance that was issued on April 4 similarly encourages a broader range of communication with families, including notifying families of all residents when anyone who has been in the facility has actual or suspected COVID-19, and encouraging frequent communication through direct and internet means on the status of prevention efforts in the facility. The guidance applies to all facilities and provides communications best practices for facilities with and without COVID-19 cases. CDC issued similar guidance on March 13.

Immediately before opening the hotline, OAG received numerous reports that nursing homes across New York were doing a poor job of such communication. The most concerning reports indicated some families were not even informed that their family member was ill prior to hearing of their death. The reports also suggested that some facilities were extremely insensitive in their communications.[19]

As only a violation of the executive orders were immediately sanctionable, which could not be accomplished in the short-run, OAG's main goals were to:

> » Identify facilities doing a poor job of compliance with, or violating, the executive orders;

> » Communicate with facilities and require them to change practices immediately; and,

> » Communicate with DOH, if necessary, to solve these and other problems.

OAG employees responded to each caller, and, with the information from such discussions, often made further contact directly with facility administration. From April 23 through November 16, the hotline received 953 contacts, the vast majority of which were received through August 3 (774 complaints). Of the complaints received through August 3, 653 related to identifiable facilities in the state. In those communications, 276 different facilities were named. Notably, these facilities were located throughout the state and were not over-represented in the areas initially hardest hit by COVID-19 deaths. This wide geographic distribution strongly indicates that even though some of the facilities were not immediately challenged by extremely ill residents, they were nonetheless unprepared to handle relatively basic communication issues. (While a few calls also named hospitals or assisted living facilities, they do not significantly alter the numbers or distribution.)

*MFCU Nursing Home COVID-19 Hotline Intake by Region  4/23/2020 – 8/3/2020* [20]

| New York Region (with Counties of Facilities Subject of Intakes) | Number of Intakes |
|---|---|
| Capital Region<br>*Albany, Columbia, Greene, Rensselaer, Schenectady, Warren, and Washington* | 68 |
| Central New York<br>*Cayuga, Madison, and Onondaga* | 24 |
| Finger Lakes<br>*Livingston, Monroe, Orleans, and Wayne* | 35 |
| Long Island<br>*Nassau and Suffolk* | 130 |
| Mid-Hudson<br>*Dutchess, Orange, Rockland, Sullivan, Ulster, and Westchester* | 104 |
| Mohawk Valley<br>*Fulton, Herkimer, Montgomery, Oneida, and Otsego* | 16 |
| New York City<br>*Bronx, Kings, New York, Queens, and Richmond* | 196 |
| Southern Tier<br>*Broome, Chemung, and Steuben* | 24 |
| Western New York<br>*Erie and Niagara* | 56 |
| Total | 653 |

OAG staff were able to address the bulk of these hotline contacts through a variety of interventions, including:

» Direct communication to facilities, with verbal or written warnings in some instances;

» Direct communication to facilities, identifying weaknesses and connecting people;

» Referrals to OAG investigation teams for longer-term follow-up;

» Comfort and clarity to family members who were not well informed of their options and avenues for communications.

While the executive orders and DOH guidance used the non-specific term "family," most facilities keep contact information and privacy authorizations for "designated representatives" or "next of kin." Given the wide variety of human relationships, the phrases can indicate different individuals within a given family or other individuals acting pursuant to a resident's designation. Greater precision as to such legal terms in future guidance would help clarify expectations of family members in their communications with facilities.

# Preliminary Findings from OAG Investigation and Data Analysis

OAG's investigations conducted during and in the aftermath of the first wave of the pandemic reflect preliminary findings as to factors that increased risks of COVID-19 transmission to nursing home residents.

## A. Lack of Compliance with Infection Control Protocols Put Residents at Increased Risk of Harm During the COVID-19 Pandemic in Some Facilities

During phase one investigations, OAG received multiple reports through the COVID-19 hotline and direct communications to OAG that several nursing homes failed to implement proper infection controls to prevent or mitigate the transmission of COVID-19 to vulnerable residents. Among those reports were allegations that, despite medical best practices, existing regulations, and specific COVID-19 guidance from CDC, CMS, and DOH, several nursing homes in all regions of the state failed to plan and take proper infection control measures, including:

» Failing to properly isolate residents who tested positive for COVID-19;

» Failing to adequately screen or test employees for COVID-19;

» Demanding that sick employees continue to work and care for residents or face retaliation or termination;

» Failing to train employees in infection control protocols; and,

» Failing to obtain, fit, and train caregivers with PPE.

### 1. Pre-Existing Infection Control Requirements for Nursing Homes

Infection prevention and control has long been a fundamental aspect of basic nursing home care. Nursing homes are expected to take all reasonable steps to avoid the transmission of disease. Never was this obligation more important than during the early stages of COVID-19, nor will it be less important as we continue to navigate through this global pandemic. Nursing home infection control regulations, which have been in effect for years, require every nursing home to maintain an infection control program with policies designed to provide a safe, sanitary, and comfortable environment in which residents vulnerable to infection reside (and where their health care providers work).[21] A facility is required to have an infection control program in which the facility: (1) investigates, controls, and takes action to prevent infections in the facility; (2) determines what procedures, such as isolation, should be utilized for an individual resident to prevent continued transmission of a disease; and, (3) maintains a record of incidence and corrective actions related to infections. Nursing homes are required to isolate residents and properly sterilize and store all equipment to prevent the spread of infection. Facilities are required to mandate basic infection control practices including ensuring staff wash their hands after each direct resident contact and properly handle and store linens.[22]

### 2. Health Oversight Agencies Directed Nursing Homes to Strengthen Pre-Existing Infection Control Policies at the Onset of the COVID-19 Pandemic

On March 11, DOH issued COVID-19 guidance to nursing homes setting forth the facts of the virus as known at the time, DOH's expectations of nursing homes during the pandemic, and applicable infection control procedures that each facility was required to follow to ensure the safety of residents and staff during the COVID-19 outbreak. Citing the nationally reported COVID-19 outbreak at the Life Care Center nursing home in the state of Washington in late February, DOH warned New York nursing homes that the "potential for more serious illness among older adults, coupled with the more closed, communal nature of the nursing home environment, represents a risk of outbreak and a substantial challenge for nursing homes." DOH noted that it was "essential" that all nursing homes "maintain situational awareness about the disease, its signs and symptoms, where cases and outbreaks are occurring, and necessary infection prevention and control procedures by regularly visiting" CDC and DOH websites to review the most up-to-date information. DOH advised nursing homes that they "must review and reinforce their policies and procedures with all staff, residents, and visitors regarding infection prevention and control."[23]

In addition to DOH's continuing COVID-19 guidance and pre-existing New York nursing home regulations mandating strict infection controls, federal health oversight agencies also issued guidance and directives to the nursing home sector to tighten infection control measures to protect nursing home populations. As early as February 6, CMS issued guidance noting that "[b]ecause coronavirus infections can rapidly appear and spread, facilities must take steps to prepare, including reviewing their infection control policies and practices to prevent the spread of infection."[24] On March 13, CMS issued directives to nursing homes nationally to prevent the further spread and transmission of the virus to "America's seniors, who are at highest risk for complications from COVID-19," including:

> » Restricting all visitors except for compassionate care, such as end-of-life situations;

> » Restricting all volunteers and nonessential personnel;

> » Canceling all group activities and communal dining; and,

> » Screening residents and personnel for fever and respiratory symptoms.

In conjunction with CMS's directives, CDC issued several notices including a coronavirus "Preparedness Checklist for Nursing Homes and other Long-Term Care Settings," as "one tool in developing a comprehensive COVID-19 response plan."[25] The checklist identified key areas that long-term care facilities should consider in their COVID-19 planning. It also included several key planning recommendations, such as incorporating COVID-19 into written emergency plans[26] and instructions on infection control policies.

### 3. Examples of Preliminary Findings Regarding Infection Control Practices

Below is a representative factual summary of some of the allegations received by OAG from March 11 to June 30 regarding infection control. Given that this is a preliminary report, the sources of the information and the subject nursing homes will remain confidential to protect the identity of witnesses and the integrity of ongoing investigations.

These factual summaries are not meant to convey legal conclusions. The examples laid out represent facilities that are under investigation that could result in legal action, facilities that are no longer under investigation due to lack of evidence or confirmed wrongdoing, and facilities that OAG is continuing to closely monitor.

Starting in March, OAG received several reports from concerned staff and family members that nursing homes failed to ensure proper infection prevention and control practices. In OAG's COVID-19 rapid-response model, investigative teams followed up on these reports, interviewed key staff at the subject nursing homes, and, if necessary, reviewed records produced by the facilities either voluntarily, pursuant to OAG's authority to demand the production of records under 18 NYCRR § 504.3 or by subpoena pursuant to New York Executive Law § 63(12). OAG determined that several of these reports required additional investigation or referral to DOH.

#### CMS Star Ratings – Staffing versus Overall

The CMS Staffing rating is a separately published rating for each facility. It is also a component of the rating published as the Overall rating of a facility, along with two other separate ratings. The Staffing rating specifically reflects the number of staffing hours in the nursing department of a facility relative to the number of residents. This ratio is expressed as a star rating, with the lowest rating of 1-Star signifying the lowest number of staff per resident, and the highest rating of 5-Star signifying the highest number of staff per resident.

On March 1, 21 percent of New York's 619 nursing homes had very low Staffing and/or Overall ratings, as shown in this chart:

| Category | Number of New York State Nursing Homes |
|---|---|
| CMS 1-Star Staffing rating<br>*(22 of which has 1-Star Overall ratings)* | 75 |
| CMS 2-Star Staffing rating and 1-Star Overall rating | 58 |

*a. Failure to Isolate COVID-19 Residents Put Residents and Staff at Increased Risk of Harm*

OAG received several credible reports from concerned staff and family members that nursing homes failed to promptly isolate residents who they knew or presumed to have had COVID-19. For example, in early April, a Certified Nursing Assistant (CNA) from a for-profit nursing home in New York City with CMS 2-Star Staffing and 4-Star Overall ratings reported that residents who tested both positive and negative for COVID-19 were simply treated with Tylenol, without isolation, or any other specific respiratory care. A few days later, OAG received a report from a member of the family council of the same nursing home alleging several concerns about how the facility responded to the COVID-19 pandemic. Among the complaints was that the facility was not properly sanitizing rooms of residents after they were transferred from the rooms.

Early in the COVID-19 pandemic, OAG began a preliminary investigation into a for-profit nursing home in New York City due to indications of neglect, including: a high number of resident deaths, poor performance during past DOH inspections, and the lowest possible CMS ratings (1-Star Staffing and 1-Star Overall). OAG received reports of multiple problems at the facility, including failure to isolate residents who tested positive for COVID-19. CDC and DOH conducted an infection control survey and found that the facility, while in need of policy changes, was in compliance with New York and federal infection control guidelines.

In mid-May, OAG received an anonymous call to the hotline in which the caller indicated that COVID-19 positive residents at a for-profit nursing home north of New York City with CMS 3-Star Staffing and 3-Star Overall ratings were intermingled with the general population for a period of time that allegedly ended in mid-May, when the facility started using its first floor as the designated COVID-19 floor. During an interview conducted by OAG investigators shortly thereafter, the administrator stated that the facility had not yet created a "COVID-19 only" unit but that it had placed COVID-19 positive residents in private rooms. He indicated at that time that the facility was planning on using one floor or part of a floor just for those residents.

### b. Continued Communal Activities, Including Communal Dining, Put Residents and Staff at Increased Risk of Harm

In late April, weeks after communal activities, including communal dining, were restricted by CMS and DOH, OAG received an allegation from a family member of a resident that a for-profit Long Island nursing home with CMS 2-Star Staffing and 3-Star Overall ratings was still operating communal dining. OAG investigators promptly contacted the facility staff who admitted to OAG investigators that "aspiration precaution"[27] dementia residents were still being brought into the dining room for meals irrespective of COVID-19 status. They stressed that social distancing was observed and that only one resident would be allowed to sit at a table that typically would accommodate six residents. They explained that the decision to continue communal dining was made given the elevated levels of supervision required for residents at risk of aspirating. This purported safety concern directly implicates staffing. Aspiration precautions requires fewer staff if done in a group setting. After the OAG interview, the facility reportedly changed its policy and ensured that all residents would take meals in the rooms under appropriate supervision depending on each resident's care plan.

### c. Lax Employee Screening Put All Residents and Staff at Increased Risk of Harm

OAG received reports that nursing homes did not properly screen staff members before allowing them to enter the facility to work with residents. Among those reports, OAG received an allegation that a for-profit nursing home north of New York City with CMS 2-Star Staffing and 4-Star Overall ratings failed to consistently conduct COVID-19 employee screening. It was reported that some staff avoided having their temperatures taken and answering a COVID-19 questionnaire at times when the facility's front entrance screening station had no employee present to conduct the screening, and when staff entered through a back entrance to the facility.

### d. DOH Inspections Increased Facility Compliance with Infection Control Protocols

During an inquiry at a for-profit Western New York facility with CMS 1-Star Staffing and 1-Star Overall ratings, a Registered Nurse (RN) reported to OAG that immediately prior to the facility's first DOH inspection in late April, a nurse supervisor had set up bins in front of the units with gowns and N95 masks to make it appear that the facility had an adequate supply of appropriate PPE for staff. The RN alleged that the nurse supervisor came in to work unusually early at 5:30 AM the day of the first inspection and brought out all new PPE and collected all of the used gowns. Although the initial DOH survey conducted that day did not result in negative findings, DOH returned to the facility for follow-up inspections, issued the facility several citations, and ultimately placed the facility in "Immediate Jeopardy." "Immediate Jeopardy" means a deficiency has resulted in the provider's noncompliance, "has caused or is likely to cause serious injury, harm, impairment or death to the residents" and immediate action is necessary to address it.[28]

It was also reported to OAG that at a for-profit nursing home on Long Island with CMS 2-Star Staffing and 5-Star Overall ratings, COVID-19 patients who were transferred to the facility after a hospital stay and were supposed to be placed in a separate COVID-19 unit in the nursing home were, in fact, scattered throughout the facility despite available beds in the COVID-19 unit. According to the report, this situation was resolved only after someone at the facility learned of an impending DOH infection control survey scheduled for the next day, before which those residents were hurriedly transferred to the appropriate designated unit.

CMS and DOH conducted onsite infection control surveys at nursing homes statewide, which helped decrease risks to residents.[29] DOH provided infection control support in an effort to enforce compliance with regulations and guidance designed to protect residents. While these efforts helped, OAG's preliminary investigations indicate that nursing homes' lack of compliance with infection control protocols resulted in increased risks to residents at a number of facilities.

## B. Nursing Homes with Low CMS Staffing Ratings Had Higher COVID-19 Fatality Rates

Most of the state's nursing homes are for-profit, privately owned and operated entities. There were 401 for-profit facilities, 189 not-for-profit facilities, and 29 government facilities statewide as of June 1. Not-for-profit facilities operate for the charitable purpose set forth in their charters. Government facilities have a public service mission. For-profit facilities are, by definition, operated with a goal of earning profit. Of the 401 for-profit facilities, more than two-thirds have the lowest possible CMS Staffing rating of 1-Star or 2-Stars. Similarly, of the 100 facilities in New York state with a CMS 1-Star overall rating, 82 are for-profit facilities.

While New York has minimal staffing level requirements for nursing homes, nursing homes require sufficient staffing levels on a daily basis and over the long haul in order to be able to provide the care required by New York law, including by individualized resident care plans. The main direct caregivers in a nursing home are, in order of training, CNAs, Licensed Practical Nurses (LPN), and RNs. These staffers are the bulk of the caregivers in a facility and have primary, daily contact with residents. CNAs provide assistance with activities of daily living, such as ambulation, transfers to/from bed, feeding, hygiene, toileting, bathing, dressing, bed cleaning and adjustments, turning and positioning of immobile patients, and other care and comfort. LPNs primarily focus on medication administration, monitoring vital signs, and providing certain treatments. RNs primarily focus on acute care needs, complex treatments, compliance with medical orders, communication with physicians and specialists, record-keeping, and complex health assessments.

Data presented in Appendix B hereto reflects that financial incentives within the current system result in a business model in too many for-profit nursing homes that: (1) seeks admission of increased numbers of residents to reach census goals; (2) assigns low numbers of staff to cover the care needs of as many residents as feasible; and, (3) transfers facility funds to related parties and investors that the home could otherwise invest in staffing to care for residents – essentially taking profit prior to ensuring care. In this model, hiring additional staff above the numbers set in low staffing models, and/or offering a higher wage in order to obtain more employees in the current labor market, are viewed as optional and unnecessary expenses. OAG's past cases and ongoing investigations reflect that this business model too often also includes extracting and transferring revenue received by for-profit nursing homes to related parties in a manner that enriches entities and individuals who have control over the nursing home, as well as their family members and business associates, at the expense of resident care and safety. These transfers of funds from such for-profit nursing homes occur through a variety of complex contractual relationships and transactions between private parties in order to enhance profit for owners, investors, landlords, and other private parties with relationships to the nursing home owners and operators, even though New York regulations prohibit directly extracting capital from a facility unless certain criteria are met. Notably, almost all revenue for nursing homes is from public funds — Medicare, Medicaid, and other state and federal programs — as well as funds such as retirement-benefit health insurance. Before the pandemic, OAG investigations, prosecutions, and civil actions reflected that this low staffing business model had created conditions of systemic causes of resident neglect and abuse at a number of facilities. *See, e.g.,* Appendix B, B-1, and B-2 below, for an illustration of this business model.

Given the complaints of neglect received during the COVID-19 pandemic[30] and the OAG investigation findings to date, the pandemic has laid bare the risks to vulnerable nursing home residents that are inherent in a low staffing business model.

Pre-existing insufficient staffing levels in many nursing homes put residents at increased risk of harm during the COVID-19 pandemic. As nursing home resident and staff COVID-19 infections rose during the initial wave of the pandemic, staffing absences increased at many nursing homes. As a result, pre-existing low staffing levels decreased further to especially dangerous levels in some homes, even as the need for care increased due to the need to comply with COVID-19 infection control protocols and the loss of assistance from family visitors.

*I. Preliminary Investigative Findings Regarding Low Staffing Levels*

***COVID-19 and Staffing Shortages***: OAG's preliminary investigations reflect many examples where for-profit nursing homes' pre-pandemic low staffing model simply snapped under the stress of the pandemic:

» OAG received a complaint from a resident's son about a for-profit nursing home in New York City with CMS 2-Star Staffing and 5-Star Overall ratings. The complaint alleged critically low staffing levels at the facility and the resident's son voiced concern about the care his mother was receiving. His mother was never tested for COVID-19, but later died while exhibiting COVID-19 symptoms. For several weeks, the facility was short of caregivers due to COVID-19 illness and quarantine, and most of its management was either out ill or working remotely. During one period of time between late March and early April, the director of nursing, the assistant director of nursing, and the medical director were all out ill and the administrator was working from home, leaving onsite management of the entire facility in the hands of just two nurse supervisors. Two to three weeks later, residents started dying from COVID-19. During the week of April 5, 33 residents died – 15 percent of all the patients in the facility. In mid-April, the administrator was overwhelmed and stated that the facility's greatest need was staffing.

» A for-profit facility in Western New York with CMS 1-Star Staffing and 1-Star Overall ratings was named in multiple reports from employees for having insufficient staffing, especially on the weekends. One CNA reported that on a day in late March, for at least a few hours, there was only one CNA in the entire building of approximately 120 residents. She also reported that on a day in mid-April, there was one CNA on each hall, one RN to cover the Rehabilitation and Dementia units, and one supervisor performing double duty by dispensing medication from two medicine carts. An RN stated that during a weekend late in May, during the day shift, one nurse called out and another nurse was a "no call no show," leaving one nurse for the entire building. The same RN stated that on a later day in May, she worked an overnight shift for which she was the only nurse for three units. Facility records indicate that only one nurse was on duty during the day shift the following day. Another employee alleged that the staffing levels at the facility were so low that CNAs, rather than nurses licensed to do so, were dispensing medications to residents. According to various staff members, the facility required staff who were not licensed clinicians to take an eight-hour temporary CNA course and to cover shifts working as CNAs.[31]

» A for-profit nursing home in New York City with CMS 2-Star Staffing and 5-Star Overall ratings indicated that in late March and early April, the facility's low staffing levels were decreased further due to staff illness and quarantine from COVID-19. A nursing supervisor alleged in mid-April that she had been working for 21 days straight, 14 hours per day, and described a facility stretched to the absolute limit to care for its residents. The following week, the nurse and the administrator conveyed that staffing levels had improved and that staff who had been out sick and quarantined were returning to work, staff were working extra shifts, and the facility used agency staffing of direct caregivers to supplement care provided by facility employees. The facility reported to OAG that it had 32 COVID-19 deaths during the three-week period with decreased staffing.

Preliminary investigations also indicate that residents at a number of facilities with pre-existing low CMS Staffing ratings faced other, predictable, increased risks. As nursing home resident and staff COVID-19 infections rose during the first wave of the pandemic, staffing absences increased at many nursing homes. Often, as health care workers became infected with COVID-19, they were either asymptomatic and continued working, or became ill and/or were required to self-quarantine under CDC and DOH guidance. When low staffing levels dropped further due to staff COVID-19 illness or quarantine, there were even fewer staff available to care for residents' needs at these facilities. At the same time, when residents had COVID-19, their individual and collective care needs increased due to the need to comply with COVID-19 infection control protocols. This need increased the workload for the remaining staff providing direct care in several respects, even as low staffing numbers dropped further. These decreases in staffing levels occurred at the same time that necessary visitation restrictions removed the supplemental caregiving provided pre-pandemic by many family visitors at low staff facilities.

In addition, preliminary investigations indicate that when there were insufficient staff to care for residents, some nursing homes pressured, knowingly permitted, or incentivized existing employees who were ill or met quarantine criteria to report to work and even work multiple consecutive shifts, in violation of infection control protocols. Thus, poor initial staffing before the pandemic meant even less care for residents during the pandemic: subtraction of any caregivers from an already under-staffed facility results in increased interaction among possibly infectious staff and residents, with less time for the staff to adhere to proper infection control precautions.

In addition to the examples discussed below, during an investigation of an upstate for-profit facility with  CMS 2-Star Staffing and 2-Star Overall ratings, a manager said the facility had 14 known staff members who tested positive for COVID-19 and was following all CDC guidelines before allowing COVID-19 positive staff members to return to work, which had made staffing an issue. A CNA alleged that it was common to have only one or two CNAs per unit since the COVID-19 pandemic started. The CNA added that prior to this, there were "some" staffing issues but it "was not this bad." The CNA alleged residents are "lucky" to "get toileted and cleaned up once a shift…there is not enough time in the day to do it more than that." According to a nurse manager, the facility used DOH's database to hire more CNAs, which led to an improvement in staffing.

***DOH Staffing Portal Helped***: As reflected in the example above, during the COVID-19 pandemic, DOH referred facilities to an online staffing portal to help provide temporary assistance when they were experiencing staffing shortages due to staff illness and quarantine. This resource helped several nursing homes address staffing problems.

***Multiple Complaints of Insufficient Staffing***: OAG received several other complaints and allegations of insufficient staffing due to COVID-19 in facilities that had pre-pandemic low CMS Staffing ratings:

» The daughter of a resident at a for-profit facility north of New York City with CMS 2-Star Staffing and 5-Star Overall ratings reported that the facility experienced even lower staffing in May. The daughter said that the facility was short-staffed and that employees said the facility "forgot" to call her for about a week to inform her that her father tested positive for COVID-19.

» Complaints regarding a for-profit nursing home in New York City with CMS 1-Star Staffing and 1-Star Overall ratings claimed the facility experienced staffing absences early in the pandemic, but reportedly addressed these shortages by contracting or hiring additional staff.

» An employee complained that a for-profit nursing home on Long Island with CMS 2-Star Staffing and 5-Star Overall ratings had an insufficient number of staff due to staff being out sick. The facility reportedly tried to fill vacant positions by using staffing agencies but said there was a limited pool of personnel from which it could hire. It later reportedly supplemented staffing with agency staffing.

» A staff member at a for-profit nursing home on Long Island with CMS 2-Star Staffing and 3-Star Overall ratings alleged low staffing levels. Facility management acknowledged that low staffing levels had decreased from the pre-pandemic level to an insufficient level due to staff being out sick or being unable to work due to the need to care for the staff's family members. The facility sought to address the vacancies by incentivizing staff to work additional shifts, specifically by paying bonuses and by paying "hazard pay," which is additional pay above the employee's salary to compensate for working in an environment where COVID-19 infection exists and therefore presents increased health risks to the employee.

» A staff member at a for-profit nursing home on Long Island with CMS 4-Star Staffing and 4-Star Overall ratings alleged, and the facility acknowledged, that low staffing levels had decreased from the pre-pandemic level to an insufficient level, due to staff being out sick or being unable to work due to the need to care for the staff's family members. The facility sought to address the vacancies by paying $2 per hour more in hazard pay to incentivize staff to work additional shifts and by utilizing staffing agencies to provide per diem staff.

» Management at a for-profit nursing home in New York City with CMS 1-Star Staffing and 3-Star Overall ratings admitted that the facility experienced a shortage of staff below pre-pandemic levels from the end of March to the beginning of April. At the time of the preliminary investigation, the facility stated that its employees were stepping up and working double and triple shifts, with managers helping as well by distributing medications and filling in to help with some of the tasks that needed to be done to care for the residents.

OAG's phase one investigations also found that under conditions of pre-existing low staffing levels that were exacerbated by COVID-19, many nursing homes placed frontline health care workers under incredibly challenging and exhausting circumstances for extended periods of time, where they pushed themselves to the brink physically and emotionally. While working in an environment in which they knew COVID-19 was present and posed health risks to themselves and their families, many direct care staff worked multiple double shifts, repeatedly and over extended periods of time, doing incredible and compassionate work in attempt to care for the needs of many isolated, vulnerable, and ill residents. OAG heard many reports of direct care workers pushing themselves under extremely challenging circumstances of insufficient staffing — to the point of exhaustion, serious illness, and in some cases, the ultimate sacrifice of their own lives.

Many nursing homes mandated or encouraged health care workers to work multiple double shifts, repeatedly and over extended periods of time, because their pre-pandemic low staffing levels decreased further during the pandemic. Preliminary investigations illustrate that a number of health care workers believed that unless they worked under these strenuous conditions to provide necessary care to the residents, their needs would otherwise have gone unmet, in light of the nursing home's decisions on staffing levels.

When staffing levels decreased in low staffed facilities, the workload of RNs, LPNs, and CNAs increased in volume in four ways: (1) workers had to perform extra steps in caring for residents that were required to comply with COVID-19 infection control protocols; (2) workers' duties to provide more care to residents also increased as residents became ill with COVID-19; (3) workers' assignments also changed as staffing levels dropped and they were required to provide care to an increased number of residents in a single shift; and, (4) workers also often had to work a higher total number of hours per day or week when they were mandated or volunteered to work multiple shifts to cover for call-outs or other staff absences. The stress on direct care providers working under these circumstances for a prolonged period of time predictably took a heavy toll on their health and well-being. It also imposed a practical limit on the number of hours of caregiving these individuals could work over a sustained period of time. While the owners of for-profit nursing homes that operate in a low staffing business model have the power to change this dynamic, OAG's investigations reflect that they lack the motivation to do so. The results are tragic and, at this point, predictable, even as the second wave of COVID-19 continues.

***Staffing Shortages Impacted Infection Control Compliance***: As previously discussed, preliminary investigations indicate that infection control within nursing homes was a significant problem during the pandemic. At the same time that nursing homes with pre-pandemic low staffing levels were experiencing decreased staffing due to COVID-19, the staff's capacity to provide care to residents decreased because complying with infection control protocols required investing additional time in their duties. Reports also reflect instances where low staffing levels resulted in staff perceptions that the facility pressured them to work in violation of infection control protocols and other guidance that was designed to protect residents.

## 2. CMS Staffing Ratings Correlate More Strongly with COVID-19 Death Rates than CMS Overall Ratings

OAG's preliminary analysis, based on DOH's published[52] statistics of deaths in nursing homes from confirmed COVID-19 cases and presumed COVID-19 cases, shows a strong correlation to the CMS Staffing rating.[33] Nursing home residents died at a higher rate – deaths per average population of residents — in facilities that entered the COVID-19 pandemic with low CMS Staffing ratings. This data reflects that facilities with the highest CMS Staffing ratings had much lower death rates.

OAG's data analysis set forth in this preliminary report relies primarily on two data sources: the data made available through the "CMS Care Compare" website and DOH's daily reports of nursing home COVID-19 deaths. The New York state data, "Nursing Home and ACF COVID Related Deaths Statewide", are a publication by DOH of statistics self-reported by nursing homes and adult care facilities to DOH during the COVID-19 pandemic. As previously noted, OAG found discrepancies between COVID-19-related death data publicized by DOH and information reported to OAG during investigations. For the death data analysis below, OAG used the DOH-published figures, except where noted. The analysis revealed that most nursing home residents live in a CMS 1-Star or 2-Star Staffing rated facility. To avoid skewing the rate of COVID-19 deaths, OAG divided the total COVID-19 death count in each facility by the total resident count in each facility. This calculation results in a direct comparison across all facilities, which produces a COVID-19 death rate uninfluenced by the census of CMS 1-Star and 2-Star Staffing rated facilities.

With the exception of certain combinations of data points, the death rate increases as the CMS Staffing rating decreases, regardless of the CMS Overall rating. Thus, nursing home facilities with CMS 5-Star Overall ratings still saw the highest death rates if they had CMS 1-Star or 2-Star Staffing ratings. Indeed, facilities with 3-Star Overall ratings evinced lower death rates if their base staffing levels were high.

In the chart below, facilities with CMS 5-Star Overall ratings had an observed death rate of nine residents out of every 100 when their CMS Staffing rating was 1-Star or 2-Star. That rate dropped nearly by half, to five out of 100, if the facility had a CMS 5-Star Staffing rating.[34] Relatedly, facilities with low CMS Staffing ratings had higher death rates than similar CMS Overall rated facilities.[35] The chart includes all deaths from March 1 to November 16.



**COVID-19 Death Rate per CMS Overall and CMS Staff Star Rating** (Mosaic Plot)

Death Rate
10.0%
7.5%
5.0%
2.5%
0.0%

| CMS Staff Star Rating | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| 5 | 6.8% | 0.0% | 1.8% | 5.2% | |
| 4 | 3.6% | 0.9% | 2.6% | 7.6% | |
| 3 | 2.7% | 2.5% | 5.8% | 5.6% | 7.4% |
| 2 | 4.2% | 5.9% | 8.0% | 7.1% | 9.0% |
| 1 | 7.1% | 8.5% | 5.3% | 7.0% | 9.0% |

**CMS Overall Star rating**

### a. The Majority of the COVID-19 Reported Nursing Home Deaths Occurred in CMS 1-Star and 2-Star Staffing Rated Homes

As of November 16, DOH reported 6,645 nursing home COVID-19 resident deaths (confirmed and presumed). Nursing homes with CMS 1-Star or 2-Star Staffing ratings represented an outsized number of deaths, as compared to nursing homes with higher CMS Staffing ratings.

**Table A — Distribution of Nursing Home Deaths as of November 16 by CMS Staffing Rating**

| CMS Staffing Rating as of 6/1 | Number of Facilities | Percentage of Total Facilities | Total COVID Deaths 11/16 | Percentage of Total | Total Average Census 6/1 | Death rate per Resident |
|---|---|---|---|---|---|---|
| 1 | 77 | 12.44% | 975 | 14.67% | 13,671 | 7.13% |
| 2 | 266 | 42.97% | 3426 | 51.56% | 49,542 | 6.92% |
| 3 | 169 | 27.30% | 1611 | 24.24% | 28,975 | 5.56% |
| 4 | 68 | 10.99% | 478 | 7.19% | 9,329 | 5.12% |
| 5 | 31 | 5.01% | 97 | 1.46% | 1,965 | 4.94% |
| NO RATING | 8 | 1.29% | 58 | 0.87% | 600 | 9.67% |

Of the state's 401 for-profit facilities, over two-thirds – a total of 280 – entered the COVID-19 pandemic with CMS 1-Star or 2-Star Staffing ratings.[36] As of November 16, 3,487 COVID-19 resident deaths (over half of all deaths) occurred in these 280 facilities. Also concerning has been the recent trend observed by OAG of for-profit owners buying not-for-profit nursing homes in transactions that result in more for-profit facilities.[37]

**b. Staffing Was More Determinative of Death Rates Than "COVID-19 Geography" During the Initial Wave of the Pandemic**

As noted by DOH, the harshest impact of the first wave of COVID-19 was in New York City and neighboring counties, which reflect eight of the ten highest populated counties in the state. Those counties also host the greater number of CMS 5-Star Staffing rated facilities as well as the greatest number of CMS 5-Star Overall rated facilities. As DOH noted, even 5-Star Overall rated facilities in those counties had high death rates.[38]

However, OAG found that when controlling for geographic variance among nursing facilities, CMS 5-Star Staffing rated facilities nonetheless suffered a lower death rate compared to facilities with low CMS Staffing ratings.[39] Thus, a resident anywhere in New York was likely to face roughly half the risk of death from COVID-19 if cared for in a CMS 5-Star Staffing rated facility.

**Weighted Death Rate Controlled for Geographic Variance, by CMS Staffing Stars**

| Star Rating | Overall weighted death rate | Staffing weighted death rate |
|---|---|---|
| 1 | 5.56% | 6.03% |
| 2 | 5.59% | 6.94% |
| 3 | 6.89% | 7.56% |
| 4 | 5.83% | 6.07% |
| 5 | 6.60% | 2.97% |

## C. Lack of Sufficient PPE for Nursing Home Staff Put Residents at Increased Risk of Harm During the COVID-19 Pandemic in Some Facilities

New York state and federal laws and guidance require nursing homes to follow infection control protocols, which include obtaining sufficient infection control supplies such as PPE to provide to staff and residents to protect them from the risk of infection from transmissible disease, including COVID-19. Science, common sense, and OAG's preliminary findings following initial COVID-19 investigations indicate that a nursing home's lack of sufficient PPE and failure to comply with CDC and DOH guidance increased the risk that COVID-19 spread to other residents and staff within the facility. Conversely, OAG's preliminary investigations indicate that residents had better health outcomes in nursing homes that had trained staff and plans in place to obtain sufficient PPE.

OAG received multiple reports that during the first wave of the pandemic, several nursing homes across the state had woefully inadequate PPE to prevent the transmission of COVID-19. OAG received allegations that due to PPE shortages, facilities violated basic infection control practices by requiring staff to re-use PPE or to clean used PPE. OAG received a report that in a for-profit facility in Western New York with CMS 2-Star Staffing and 2-Star Overall ratings, there was a lack of PPE for staff use until the first resident with suspected COVID-19 went to the hospital, and that an LPN at the facility was allegedly forced to resign after she questioned inadequate PPE policies and refused to work under conditions where staff and residents would not be safe. In early April, OAG heard from several other employees of that same nursing home who advised OAG that the staff at the facility allegedly were not provided adequate PPE for several weeks at the beginning of the pandemic and were forced to share gowns, which were kept hanging in hallways on hooks. OAG also heard that, in addition to not having adequate PPE, the facility allegedly violated basic infection control protocols by allowing communal dining, contrary to government-issued guidance, until the first resident went to the hospital in late March. Another LPN at this facility reported that she cared for a COVID-19 positive resident with only sanitizer and gloves because that was all that was available at the time and facility management told her and other staff members that they would have to make do with what they had. According to the LPN, there were not enough surgical masks to change between COVID-19 positive and negative residents and staff were instructed to make surgical masks last as many days as possible. She reported that the facility did not have N95 masks or face shields and that staff resorted to using surgical masks or homemade cloth masks, gloves, and "contaminated" shared gowns.

Regarding a for-profit nursing home in Western New York with CMS 1-Star Staffing and 2-Star Overall ratings, OAG received a report from a nurse manager that the owner of the facility directed staff not to wear masks and that it would be "business as usual" because the facility did not have sufficient PPE. This nurse manager allegedly went directly to the New York State Office of Emergency Management (OEM)[40] to attempt to obtain additional PPE for her staff. The same nurse manager reported that inexplicably her decisions were continually undermined by ownership. For example, after the nurse manager allegedly attempted to stop communal dining after CDC guidance restricting communal activities, ownership reversed her decision days later and resumed communal dining. Another RN supervisor at this facility resigned when she began to feel like continuing to work was putting her license at risk due to inadequate PPE at the facility. A CNA from this facility also reported that "masks were optional" even after visitors were barred from the facility and there was no quarantining of residents until weeks into the pandemic.

Though these reports allege that these facilities did not have adequate PPE during the first few months of the pandemic, and investigations are ongoing, OAG has been assured that each of these facilities now has an adequate supply and is appropriately distributing PPE to staff.

In another continuing investigation into a different for-profit Western New York nursing home with CMS 1-Star Staffing and 1-Star Overall ratings, OAG heard from an aide who reported that between mid-March and early April, she asked the nurse supervisor of the facility for her own gown. The nurse supervisor replied to the aide that she cannot pass out PPE "willy nilly" and that gowns were only for those "on the front line," even though the aide was very much on the front line and providing direct care to residents. The aide alleged that she was eventually given a gown but told she had to reuse it every day. She noted to OAG investigators that over time those gowns became visibly soiled, such that she and her fellow caregivers threw them out and resorted to simply wearing a regular sleeping gown over their clothes when tending to residents. Some of the aide's statements were corroborated by a funeral director who reported to OAG that when he entered the facility in mid-April to retrieve a deceased resident, he observed staff wearing PPE that was only in the forms of gowns, regular surgical masks, and gloves. He stated staff did not take his temperature when he entered the facility, nor was he asked to fill out a health questionnaire. He also stated that he observed used gloves strewn on the floor of the facility.

As widely reported in the media and confirmed by OAG in its preliminary investigations, many health care institutions faced challenges to acquire and compile sufficient PPE to meet the demands placed on institutions during the COVID-19 pandemic. PPE was most scarce during the first few months of pandemic, but ultimately became more available due to the efforts of DOH, OEM, and county and local governments. New York state also coordinated with other states and worked to secure additional PPE. During preliminary investigations, OAG learned of several facilities that had dangerously low stockpiles of PPE but received additional supplies from DOH or OEM, including two for-profit facilities in New York City, one with a CMS 2-Star Staffing rating and one with a CMS 1-Star Staffing rating, and two other facilities on Long Island, both CMS 2-Star Staffing rated facilities. DOH and OEM's provision of PPE to nursing homes helped decrease risks of infection and harm to residents in many facilities.

On February 6, DOH issued a guidance to the health care industry reminding facilities to "be ready and equipped" to "manage patients presenting to their facility with the potential of being infected with [COVID-19]." The guidance reminded institutions that shortages of PPE may occur and of the importance to strictly adhere to the latest guidance from CDC. DOH instructed all facilities to compare their existing inventories of PPE against the expected rate of use of these items under a surge situation and to determine the quantities needed to be on hand. Facilities that identified a shortage of PPE were directed to use existing vendors and to activate mutual aid agreements to obtain available support if needed. If the facility was unable to obtain needed PPE from those sources, facilities were instructed to notify their local emergency management agency, DOH or, if necessary, OEM. OAG observed that many facilities that had dangerously low inventories of PPE ultimately received PPE from either DOH, OEM, their local government, or other sources, including donations from the public. On April 2, DOH issued another advisory to the health care industry noting that New York state continued to fulfill requests for PPE, as available, and that health care entities should continue to submit requests for PPE through their local emergency management agency.

OAG observed that many institutions were making good faith efforts to purchase sufficient PPE but were hampered by several external factors, including supply chain issues. OAG's preliminary findings appear to show that many nursing homes, consistent with their obligation to ensure emergency preparedness, made admirable efforts to get needed PPE in time to protect residents and health care workers. At the same time, timing and expenditure levels of effort and funds made by nursing homes to obtain PPE appear to have varied. OAG will continue to investigate whether those facilities that failed to obtain adequate supplies of PPE made good faith, but ultimately unsuccessful, efforts or whether facilities that failed to provide PPE to their staff and their residents did so due to their lack of responsible planning, their refusal to purchase critically needed PPE through available vendors, or similar conduct relating to their operations.

## D.  Lack of COVID-19 Testing for Residents and Staff in Early Stages of the Pandemic Put Residents at Increased Risk of Harm in Many Facilities

During a pandemic, the federal government plays a key role in the ability of states' access to testing for new viruses. In February, CDC's work to develop the first COVID-19 test failed, resulting in a critical delay of several weeks before CDC developed an effective test. By the time CDC sent the new test kits out to the states, COVID-19 had spread within the United States, including to New York. Afterward, CDC encouraged the Food and Drug Administration (FDA) to allow hospitals and commercial labs to produce tests for sale faster. Additional delays occurred when the FDA took weeks to begin issuing emergency authorizations for other tests.

 In March, COVID-19 testing capacity in New York state was limited. New York state agencies took action that helped protect nursing home residents, including working to obtain the ability within the state to conduct increased COVID-19 testing. At the same time, OAG's preliminary investigations indicate that nursing homes had varying degrees of access to COVID-19 testing early in the pandemic, with many lacking access to sufficient testing in March and April. Some facilities reported that once receiving test kits, the turnaround time on test results was lengthy. One facility reported that it transferred patients to the hospital because there was no other means to get testing.

After testing became increasingly available, Governor Cuomo issued an executive order requiring COVID-19 testing by nursing homes of their staff, which helped protect residents from the risk of infection and harm. DOH tested nursing home residents at various facilities, which also helped protect residents.

While testing of staff is now regular and mandatory, and testing availability has improved significantly, the preliminary investigations reflect insufficient availability of COVID-19 testing for residents and staff of nursing homes in the early stages of the pandemic. The lack of testing increased the risk of COVID-19 infection of residents and staff. If residents and staff are not tested for COVID-19, they may be infected yet asymptomatic, and unknowingly transmit the virus to others through informal contact when they otherwise would be isolated or quarantined under CDC guidance. In addition, a lack of readily available testing for residents and staff also can hinder their ability to obtain prompt and specific medical treatment for those who become symptomatic and ill.

DOH guidance issued on March 21 directed downstate nursing homes, which were in areas of high community-based transmission, to treat all residents who exhibited COVID-19 symptoms as if they had been diagnosed with COVID-19 for purposes of infection control protocols. However, if a nursing home lacked access to testing, it is possible that asymptomatic residents who were not tested and who were unable to communicate symptoms they were experiencing might not be readily apparent to staff for a period of time before symptoms were identified. Under those circumstances, those residents are at greater risk of harm from not receiving treatment and/or close monitoring for changes in condition. In addition, the circumstances create an increased risk of transmission to others in the facility.

For example, OAG received a credible allegation from the daughter of an asymptomatic nursing home resident about a for-profit upstate facility with CMS 2-Star Staffing and 1-Star Overall ratings. She alleged that the facility responded that due to the limited number of test kits at the facility, it could only test her father if he exhibited symptoms. He later exhibited symptoms, including a high fever, and was sent to the hospital where he tested positive for COVID-19.

 OAG's preliminary investigations also provide anecdotal support that staff infected with COVID-19 in certain instances worked within nursing homes during periods that they were undiagnosed and asymptomatic, thereby increasing the risk of infection and harm to residents. CDC guidance provides that when a health care provider is infected with COVID-19, "Anyone who had prolonged close contact (within 6 feet for at least 15 minutes) with the infected health care provider might have been exposed." CDC guidance also states that "if the provider had COVID-19 symptoms, the provider is considered potentially infectious beginning 2 days before symptoms first appeared." If the provider was asymptomatic and the date of exposure to COVID-19 infection can be identified, the provider should be considered potentially infectious beginning 2 days after the exposure. CDC guidance also states that the infectious period for COVID-19 is generally accepted to be 10 days after onset of the infection.

As one example, in a large not-for-profit nursing home in New York City with CMS 2-Star Staffing and 3-Star Overall ratings, a facility manager indicated that an experienced LPN worked on a unit with over 40 residents until March 14, when he stopped working, was diagnosed with COVID-19, and later died. By March 21, the facility reported 20 percent of its staff were out sick. The facility reported no COVID-19 resident deaths up to that date. From March 22 to March 29, the facility reported seven COVID-19 resident deaths, including two within the facility and five after transfer to the hospital. From March 29 to April 4, the facility reported 26 COVID-19 resident deaths, including 18 within the facility and eight after transfer to the hospital. The facility management stated that in early stages of the pandemic, DOH's Wadsworth lab was the only lab doing COVID-19 testing, and then others started, including the facility's own lab. In April, the facility stated that getting COVID-19 test results took 36 hours.

More nursing homes tested residents in April and May as testing capacity increased in the state, including in the months that followed.

*I. Testing Requirements Helped Facilities Identify Residents and Staff Who Were Infected with COVID-19*

Governor Cuomo issued Executive Order 202.19 on May 17 for DOH to establish a "statewide coordinated testing prioritization process" for all laboratories in the state, both public and private, for conducting COVID-19 diagnostic testing. Executive Order 202.30, issued May 10, required nursing homes to test full time staff twice a week for COVID-19.[41] These measures, along with the increased testing capacity, helped facilities identify residents and staff who were infected with COVID-19 and decrease the risk of transmission of infection and illness to nursing home residents and staff. Testing staff enables facilities to identify asymptomatic individuals who can then quarantine until they can safely return to work to provide care to residents. Testing residents enables facilities to identify asymptomatic individuals who can then remain isolated from non-infected residents. A lack of testing of health care workers who are at risk of COVID-19 infection increases the risk of transmission to residents when COVID-19 is present in the surrounding community.

OAG's investigations indicate that, absent Executive Order 202.30, many staff would not have been tested by the nursing homes. For example, one for-profit upstate nursing home with CMS 1-Star Staffing and 1-Star Overall ratings referred its staff to their primary physicians[42] to obtain COVID-19 testing in the earlier stages of the pandemic. However, the facility reported that after COVID-19 testing was required, it tested staff weekly. Similarly, a for-profit nursing home in New York City with CMS 1-Star Staffing and 3-Star Overall ratings reported that it had started testing residents in late March. The facility also reported that staff were tested, and that after Executive Order 202.30 providing testing guidelines, they were adhering to them.

This, and other information, indicates that absent an obligation to test staff, many nursing homes would not have tested staff for COVID-19, and many staff could not have obtained testing frequently on their own, unless testing was otherwise easily available and free.

### 2. DOH Testing Protected Residents

The preliminary investigations reflect that DOH tested many residents and staff at nursing homes later in the pandemic. For example, at a for-profit nursing home in New York City with CMS 2-Star Staffing and 1-Star Overall ratings, the administrator indicated that DOH provided facility testing and more PPE, and tested the entire facility, including residents and staff. Similarly, a for-profit facility in Western New York with CMS 2-Star Staffing and 2-Star Overall ratings that had reported a lack of testing ability, stated that its testing issues had been resolved through apparent facility-wide testing conducted by DOH. Relatively shortly thereafter, the facility reported it was COVID-free.

## E.  Lack of Nursing Home Compliance with Executive Order Requiring Communications with Family Members Caused Avoidable Pain and Distress

OAG took immediate and direct action with respect to a number of facilities regarding communication with family members. The most formal actions consisted of written warnings and cease & desist notices. Most communication issues were rapidly solved with less formal contact by OAG staffers with the facility and/or families. Three facilities were given such formal warnings, and ten facilities were advised orally that there was credible information that they were failing to comply with executive orders and action would be taken if not promptly resolved. (As noted elsewhere, roughly half of the intakes involved allegations of further or other problems at facilities.)

## F. Government Issued Guidance May Have Led to an Increased Risk to Residents in Some Facilities and May Have Obscured the Data Available to Assess the Risk

While government-issued guidance from CDC and DOH based on updated information relating to COVID-19 helped protect many New York residents, nursing home implementation of some guidance may have led to an increase risk of fatalities in some facilities and may have obscured data reported by nursing homes.

### 1. At Least 4,000 Nursing Home Residents Died After DOH's March 25 Guidance on Admission Practices

On March 25, DOH issued guidance providing that "[n]o resident shall be denied re-admission or admission to the nursing home solely based on a confirmed or suspected diagnosis of COVID-19. Nursing homes are prohibited from requiring a hospitalized resident who is determined medically stable to be tested for COVID-19 prior to admission or re-admission."[43] The guidance was rescinded on May 10 in Executive Order 202.30. From March 25 to May 8, 6,326 hospital patients were admitted to 310 nursing homes. The peak of these admissions was the week of April 14.[44] The peak single day in reported resident COVID-19 deaths was April 8, with 4,000 reported deaths occurring after that date.

Many nursing home industry and other commentators have criticized DOH's March 25 guidance as a directive that nursing homes had to accept COVID-19 patients who were infectious.[45] At the same time, the March 25 guidance was consistent with the CMS guidance on March 4 that said nursing homes should accept residents they would have normally admitted, even if from a hospital with COVID-19, and that patients from hospitals can be transferred to nursing homes if the nursing homes have the ability to adhere to infection prevention and control recommendations. It was also consistent with CDC Published Transmission-Based Precaution (T-BP) guidance, which was referred to in CMS's March 4 guidance, and which stated that if T-BP were still required for a patient being discharged to a nursing home, the patient should go to a facility with an ability to adhere to infection prevention and control recommendations for the care of residents with COVID-19. *See* Appendix A.

It is worth noting that to the extent New York hospitals had capacity concerns due to the pandemic, the March 25 guidance would have been helpful to communities where those facilities were experiencing longer COVID-19 patient stays due to delays in receiving testing results, and were at or exceeding acute care capacity while they simultaneously were anticipating more new patients in need of acute care.[46] This is because many hospitals in areas of high COVID-19 infection rates in some other states reported that "post-acute facilities were requiring negative COVID-19 tests before accepting patients discharged from hospitals."[47] This practice meant that some patients who no longer required acute care were occupying valuable hospital beds while waiting to be discharged.[48]

DOH has said that nothing in the guidance stated that a facility should accept patients who could not be safely cared for. As to whether the March 25 guidance affected risks to residents, DOH presented data[49] reflecting the spike in health care worker infection and the later spike in deaths as circumstantial support for the position that the guidance did not contribute much to resident risks or deaths. Criticism since then notes that there has been no presentation of additional evidence as to whether the admission of patients from hospitals to nursing homes may have contributed to COVID-19 transmission or COVID-19 related deaths of nursing home residents. DOH states CDC says COVID-19 positive patients cannot likely transmit the virus after nine days of infection, and that patients are most infectious within two days after symptoms appear.[50] CDC guidance also says there is uncertainty on this. DOH says the median hospital stay was nine days.

Data linking the number of nursing home deaths to the admissions policy contained in the March 25 guidance is obscured by that same guidance, which also prohibited nursing homes from requiring COVID-19 testing as a criterion for admission. This phenomenon was compounded by both the March 21 directive that largely paused the testing of downstate residents, and the under-reporting of nursing home deaths generally (as previously discussed). OAG's investigation to date has not revealed an admission from any nursing home operator that they could not care for referred residents. However, using the DOH publicized data, 4,000 nursing home deaths occurred after the issuance of the March 25 guidance, including some in 323 facilities that apparently had no reported COVID-19 infections before receiving admissions or re-admissions of hospital residents who had been diagnosed with COVID-19.[51] While additional data and analysis would be required to ascertain the effect of such admissions in individual facilities, these admissions may have contributed to increased risk of nursing home resident infection, and subsequent fatalities (whether due to actual transmission of infection from new residents to incumbent residents, or due to the facilities' poor self-assessment during the admission process that was followed by failure to provide appropriate care to that patient or other residents.)

### 2. DOH's March 21 Guidance on Testing Practices Obscured the Data

As previously discussed, OAG's preliminary investigations reflect that COVID-19 testing availability for nursing homes downstate was limited in March and April, and fraught with delays. In this context, OAG preliminary investigations reflected that in the nine downstate counties that experienced higher community-based transmission of COVID-19, some facilities stopped testing residents for COVID-19 after the March 21 guidance was issued. For example, the administrator of a for-profit facility in New York City with CMS 1-Star Staffing and 1-Star Overall ratings alleged in April that the facility was not currently testing residents for COVID-19. He alleged that DOH told the facility to stop testing at some point in March. He alleged that prior to that, the facility was conducting testing through a lab. Similarly, the administration of a for-profit facility on Long Island with CMS 3-Star Staffing and 2-Star Overall ratings alleged that the facility originally tested seven residents and had suspended the testing of residents following the DOH "directive" that tests were not required. The facility alleged that it understood that all parties should be considered infected and treated as such. A for-profit facility in New York City with CMS 3-Star Staffing and 2-Star Overall ratings alleged that while it did not have access to COVID-19 testing, it was relying on DOH guidance issued March 21 for not testing.

## G. Immunity Provisions May Have Allowed Facilities to Make Financially-Motivated Decisions

Due to several recent changes in law, it is unclear to what extent facilities or individuals can be held accountable if found to have failed appropriately to protect the residents in their care. On March 23, Governor Cuomo issued Executive Order 202.10, which created limited immunity provisions for health care providers relating to COVID-19.

The specific statute, the Emergency Disaster Treatment Protection Act (EDTPA), was enacted on April 6, and provides immunity to health care professionals from potential liability arising from certain decisions, actions and/or omissions related to the care of individuals during the COVID-19 pandemic retroactive to Governor Cuomo's initial emergency declaration on March 7. The legislation created a new Article 30-D of the Public Health Law. The legislature noted that the purpose of the EDTPA was to "promote the public health, safety and welfare of all citizens by broadly protecting the health care facilities and health care professionals in this state from liability that may result from treatment of individuals with COVID-19 under conditions resulting from circumstances associated with the public health emergency."[52]

The original form of the EDTPA,[53] in effect during the time period of this report, provided that:

> *Any health care facility or health care professional shall have immunity from any liability, civil or criminal, for any harm or damages alleged to have been sustained as a result of an act or omission in the course of providing health care services, if: (a) the health care facility or health care professional was providing health care services in accordance with applicable law, or where appropriate pursuant to a COVID-19 emergency rule; (b) the act or omission occurs in the course of providing health care services and the treatment of the individual is impacted by the health care facility's or health care professional's decisions or activities in response to or as a result of the COVID-19 outbreak and in support of the state's directives; and, (c) the health care facility or health care professional is providing health care services in good faith.[54]*

There is an exception, but it comes with a potential loophole:

> "[Immunity] shall not apply if the harm or damages were caused by an act or omission constituting willful or intentional criminal misconduct, gross negligence, reckless misconduct, or intentional infliction of harm. *. . provided, however, that acts, omissions or decisions resulting from a resource or staffing shortage* [emphasis added] shall not be considered to be willful or intentional criminal misconduct, gross negligence, reckless misconduct, or intentional infliction of harm."[55]

The EDTPA is silent as to whether the safe-harbor for "resource or staffing shortage" is to be assessed only based on conditions that arose as a result of the COVID-19 emergency or whether it intended to include such shortages existing prior to the emergency period. As seen in this report, pre-pandemic staffing shortages are associated with deaths from COVID-19. Therefore, the question of the scope of immunity is important in determining remedies.

To the extent that the executive order and/or EDTPA were interpreted by any nursing homes as providing blanket immunity for harm to residents other than intentional harm, even if the harm was related to intentional resource and staffing allocations, Attorney General James disagrees with such an interpretation as illogical, contrary to public policy, and contrary to the law's intent. The intent was to support health care professionals making impossible health care decisions in good faith during this unprecedented crisis. As exemplified in subsections below, the preliminary investigations illustrate instances of facility decisions that relate to or affect resident care that are financially motivated, rather than clinically motivated. OAG investigations will continue as to acts both prior to, and after, the August 3 amendments to Public Health Law Article 30-D.

***Admissions Decisions and Staffing Decisions***: A facility's decision to admit new residents is also a staffing decision because it requires a facility to assess whether its staffing level is sufficient to provide care to meet the needs of the existing residents and any proposed new residents. When a for-profit nursing home has an empty bed, it has a financial motivation to increase its census by admitting residents in order to obtain the daily rate of reimbursement offered by the resident's payor – Medicaid, Medicare, other federal health insurance, or private insurance.[56]

During the pandemic, many facilities experienced empty beds as residents died from COVID-19 or other causes. Some families took their loved ones to a family member's home. A decrease statewide in elective surgeries at hospitals reportedly stopped a regular flow of patients to nursing homes for rehabilitation. As discussed above, many facilities also experienced staffing reductions due to COVID-19 illness and quarantine, which necessarily decreased the facility's capacity to provide care for its residents, and, as the examples discussed herein reflect, resulted in exacerbated staffing problems.

The preliminary investigations indicate that nursing homes took a variety of approaches to decisions to admit residents during the COVID-19 pandemic, even as they were experiencing staffing shortages due to staff illness from, or otherwise inability to work due to, COVID-19. The approaches suggest admissions decisions were affected to varying degrees by financial motives, and by clinical and administrative evaluations of the facility's ability to provide appropriate care to its residents. OAG received information during its investigations that some facilities decided that the safest course was to stop admitting residents for periods of time while their staffing was low. For example, a not-for-profit nursing home in New York City with CMS 2-Star Staffing and 3-Star Overall ratings that experienced staffing shortages due to COVID-19 infection reported that it stopped admissions on March 21 due to 20 percent of staff calling in sick. In addition, to improve staffing, the facility brought in agency staff home health aides and restructured the staff.

In contrast, a for-profit nursing home in Western New York with CMS 1-Star Staffing and 1-Star Overall ratings indicated it took a different approach to admissions. Managers at that facility alleged that as of the end of April, the facility continued to accept new residents despite ongoing staffing difficulties, having nine out of 126 residents who tested positive for COVID-19, five residents dying from confirmed COVID-19, and five staff testing positive for COVID-19.

A for-profit facility in Western New York with CMS 2-Star Staffing and 2-Star Overall ratings indicated it also accepted new patients in April, but only admitted residents if they had recovered from COVID-19. However, as of April 30, according to a nurse supervisor, the facility was not taking admissions for at least a week due to the "state of the facility." The investigation reflected that the "state of the facility" included unstable conditions as alleged by staff:

» A high rate of COVID-19 positive cases, with 33 out of 59 residents testing positive;

» The facility had tested less than half of the residents;

» The facility did not have enough tests to test the remaining residents, and was trying to get more;

» 14 positive staff members and 12 more pending staff tests;

» Staffing shortages;

» The facility administrator was out sick.


As of mid-May, the nurse supervisor asserted that staffing had improved, with most staff who were out sick or quarantined returning to work. As of the following week, the acting administrator advised that staffing issues were continuing to improve, testing issues had been resolved, and facility had been COVID-19 free for two weeks, and facility expected to be taken "off precautions" from DOH shortly. The facility provided documentation indicating it had passed DOH infection control surveys in early May and mid-May.

***Financial Incentives Illustration—Admissions:*** As illustrated in the example below, the preliminary investigations reflect how the financial incentives within the current system resulted in pressure by some for-profit owners to push staff to admit increased numbers of residents from hospitals in order to reach census goals, regardless of whether the facility had sufficient staff to care for them. Specifically, in one for-profit facility in New York City with CMS 2-Star Staffing and 1-Star Overall ratings, an administrator reported communications with an owner about hospital admissions. The facility interpreted DOH's March 25 guidance not to deny admission of residents from the hospital solely on the basis of a COVID-19 positive diagnosis as "they were to admit COVID-19 residents from the hospital." The facility admitted five hospital patients on March 26, but the owners wanted to admit more. The administrator alleged that there were arguments with the owners over how many residents they could safely care for. According to the administrator, every new admission from the hospital was a patient who was "COVID positive."[57]

***Incentive Pay and Bonuses to Staff:*** Preliminary investigative findings also reflected a range of sizes of financial investment that facilities and/or owners were willing to make for short periods of time during the pandemic to provide monetary incentives to health care workers in order to retain staff, to attract new staff as full-time employees or as temporary agency staff, and to encourage staff to work additional shifts at the facility. Facilities' reported choices in providing financial incentives to increase staffing reflect different perspectives on what level of expenses were determined to be necessary versus optional. Some facilities paid small bonuses to staff for each additional shift they took, with some limiting the bonus to shifts involving work with COVID-19 positive residents. Other facilities paid generous salary increases per hour for hazard pay. Still other facilities paid staff both salary increases and bonuses per extra shift worked. Some offered hazard pay for a few weeks, while others offered it for longer periods of time. Some paid agency staff extra, while others did not.

## H. Ongoing Investigative Work

Following the first wave of COVID-19 in New York, OAG has continued to conduct in-depth investigations involving the COVID-19 impact at over 20 facilities, and to monitor and follow up as needed with the facilities that were the subject of initial investigations. During this time, OAG has received new allegations of neglect and abuse connected with COVID-19 conditions, as well as reports of neglect and abuse of nursing home residents seemingly unrelated to COVID-19, and conducted additional investigative work. OAG continues to investigate and to find and follow the facts in order to serve its mission to protect nursing home residents from abuse and neglect, and to protect Medicaid from provider fraud. OAG will continue these investigations, without fear or favor, and make recommendations regarding remedies, when and where appropriate.

COVID-19 is continuing to spread from person to person throughout our communities, bringing more illness and untimely death in our state, as well as in our nation and our world. This preliminary report serves to increase transparency and awareness of preliminary findings from the first wave in New York state, including the conditions and risks that many nursing home residents faced. This information will help to identify challenges we face together and potential solutions, and to encourage collective action by our state's residents to protect each other, and our state's vulnerable nursing home residents. The recent advent of the COVID-19 vaccine is a welcome development that will help save lives as it is distributed, providing additional protection to health care workers, nursing home residents, and, eventually, everyone. At the same time, it is not a panacea. More action is needed to protect nursing home residents, and to provide them with the care and dignity that they deserve while living in the skilled nursing facilities that are their homes.

# Regulatory Framework

## A. New York State Law on Nursing Home Requirements to Provide Care and Staffing to Meet Resident Needs

New York law explicitly recognizes that for the vast majority of nursing home residents, "the nursing home will be their last home." Accordingly, a license to operate a nursing home carries with it "a special obligation to the residents who depend upon the facility to meet every basic human need."[58] New York law recognizes that "*nursing homes should be viewed as homes as much as medical institutions* [emphasis added]."[59] Each nursing home is required to give each resident "the appropriate treatment and services to maintain or improve his or her abilities" and provide each resident with "the necessary care and services to attain or maintain the highest practicable physical, mental and psychosocial well-being, in accordance with the comprehensive assessment and plan of care subject to the resident's right of self-determination."[60] A nursing home is required to "accept and retain only those residents for whom it can provide adequate care."[61]

New York state's current minimum nursing home staffing standards require one RN for eight consecutive hours every day of the week, plus one RN or one LPN as a "Charge Nurse" 24/7 (or one charge nurse for each unit or "proximate" units for each tour of duty). This is proximate to the federal Medicaid/Medicare minimum standard. A facility must have a full-time employee RN as director of nursing who counts towards the staffing formula.

New York law requires nursing homes to provide "sufficient nursing staff and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being."[62] State law also provides that homes, in conjunction with a physician, describe each resident's needs in a "Comprehensive Care Plan," which identifies health concerns and directs particular courses of treatment, specifying, among other things, medications, assisted movement, skin care, bowel and bladder care, and nutrition needs.[63]

## B. New York State Law on Nursing Home Duties to Residents

Nursing home residents in New York have basic protections and legal rights to ensure that they are afforded their right to a dignified existence, self-determination, respect, full recognition of their individuality, consideration and privacy in treatment and care for personal needs, and communication with and access to persons and services inside and outside the facility.[64] Among those rights are adequate and appropriate medical care, and the right to be fully informed by a physician in a language that the resident can understand, using an interpreter when necessary, of their total health status, including but not limited to, their medical condition including diagnosis, prognosis, and treatment plan. Each resident or their representative has the right to ask questions and have them answered, be fully informed in advance about care and treatment, and of any changes in that care or treatment that may affect the resident's well-being.

Each nursing home has a legal obligation to communicate important information to the resident or the resident's representative. Every resident has the right to name an agent or "health care proxy" to act as their designated representative. The designated representative shall receive any written and oral information required to be provided to the resident and participate in decisions regarding the care, treatment and well-being of the resident if such resident lacks the capacity to make such decisions.[65] Each facility is required (except in a medical emergency) to notify the resident's physician and designated representative within 24 hours when there is an accident involving the resident, which results in injury requiring professional intervention; a significant improvement or decline in the resident's physical, mental, or psychosocial status; a need to alter treatment significantly; or a decision to transfer or discharge the resident from the facility.

## C. Federal Law on Nursing Homes

Nursing homes must comply with certain requirements under federal statutes and regulations in order to participate in the Medicare and Medicaid programs.[66] The Nursing Home Reform Act, updated in 2016, contains a broad mandate that nursing homes "must provide [each resident with] the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with the resident's comprehensive assessment and plan of care."[67] The law also prioritizes individualization of care plans and the primacy of resident autonomy and choice.[68] The regulation states that "[a] facility must treat each resident with respect and dignity and care for each resident in a manner and in an environment that promotes maintenance or enhancement of his or her quality of life, recognizing each resident's individuality."[69] Following this aim, residents have the right to: participate in their treatment; receive all services included in their plan of care; be free from any physical or chemical restraints that are not required to treat medical symptoms and are imposed for purposes of discipline or convenience; express grievances and have them addressed; and, engage in choice (as to activities, schedules, visitors, etc.).[70] Residents also have the right to be free from abuse, neglect, misappropriation of property and exploitation, and the facility must ensure these resident rights are upheld and report any instances where these rights have allegedly been violated to applicable state officials.[71]

Nursing homes are also specifically required to ensure residents "[m]aintain[] acceptable parameters of nutritional status, such as usual body weight" and receive "sufficient fluid intake to maintain [their] proper hydration and health."[72] Nursing homes must also develop personalized plans of care for each resident and conduct periodic assessments of each resident, at which point personal plans are "reviewed and revised."[73] The goals of the resident are also to be included in their personal care plans, and the complete interdisciplinary care team must help prepare the care plan, including the resident's attending physician, registered nurse, nurse aid, and a nutrition staff member.[74]

Nursing homes must also provide necessary services "to ensure that a resident's abilities in activities of daily living do not diminish" unnecessarily.[75] This means the facility must give residents the appropriate treatments and services so that residents can perform daily living activities (*e.g.*, personal hygiene, mobility, dining, communication) on their own. For those residents who are unable to accomplish daily living activities on their own, the facility must provide services to maintain good nutrition, grooming, and hygiene.[76] In addition, nursing homes must ensure an ongoing program of both group and individual activities based on each resident's care plan, that ensures the "well-being of each resident, [and] encourage[s] both independence and interaction in the community."[77]

Every resident must be in the care of a physician who must visit them once every 60 days and more often in the first three months of a resident's stay.[78] Nursing homes must also have "sufficient nursing staff with the appropriate competencies and skills sets...to assure resident safety" and the total "well-being of each resident, as determined by resident assessments and individual plans of care and considering the number, acuity and diagnoses of the facility's resident population."[79] Each facility must also employ sufficient staff for food and nutrition services, and the staff must possess appropriate competencies "taking into consideration resident assessments, individual plans of care and the number, acuity and diagnoses of the facility's resident population."[80]

Among other things, facilities must also provide or obtain dental services, laboratory services, radiology services, and other diagnostic services to meet residents' needs.[81] Similarly, residents requiring physical therapy, speech-language pathology, occupational therapy and/or rehabilitative services for mental disorders and intellectual disability, must be provided with such services.[82] Facilities must also "operate and provide services in compliance with all applicable federal, state, and local laws, regulations, and codes, and with accepted professional standards and principles that apply to professionals providing services in such a facility."[83] The facilities must comply with all HHS regulations, including those relating to nondiscrimination, confidentiality of health information, fraud, and abuse.[84] Operationally, they must maintain medical records containing residents' assessments, care plans, diagnostic results, and other progress notes.[85] They must also develop a quality assurance and performance improvement (QAPI) program that collects and reviews data, as well as resident and staff complaints, in order to facilitate facility improvement.[86] They are required to have a compliance program to prevent and detect criminal, civil, and administrative violations, and promote quality of care.[87]

### *1. Federal Law for Nursing Homes Especially Pertinent to the COVID-19 Pandemic*

Some federal requirements are very pertinent in the COVID-19 pandemic. Nursing homes must conduct "a facility-wide assessment to determine what resources are necessary to care for its residents competently during both day-to-day operations and emergencies." The assessment must be updated at least annually and whenever there is a "change that would require a substantial modification to any part of this assessment."[88] Additionally, nursing homes must develop, maintain and update an emergency preparedness plan. This plan must be a "facility-based and community-based risk assessment, utilizing an all-hazards approach."[89] They must complete annual emergency preparedness training based on their plan.[90]

The regulations also require facilities to have an infection prevention and control program "to help prevent the development and transmission of communicable diseases and infections."[91] The program must include "a system for preventing, identifying, reporting, investigating, and controlling infections and communicable diseases for all residents, staff, volunteers, visitors, and other individuals providing services;" and "precautions to be followed to prevent spread of infections."[92] The plan must be reviewed annually and updated as necessary and the facility must hire an infection preventionist who is responsible for the infection control plan.[93] Finally, the regulation outlining infection control was updated on May 8, 2020 to include specific reporting and communication requirements relating to COVID-19.[94]

### 2. 2019 Changes to Federal Nursing Home Regulations

In 2019, CMS made changes to nursing home regulations, including the elimination of the ban on binding arbitration agreements between facilities and residents. In July 2019, CMS rolled back regulations that had prohibited pre-dispute arbitration agreements between facilities and residents. Under the new rules, facilities are able to enter into binding arbitration agreements with residents at any point prior to a dispute, including prior to the resident living in the facility.[95] This change means that many residents will not have the ability to sue their facilities in court. It also shields nursing homes from legal accountability for their actions.

### 3. CMS's 2019 Proposed Changes to Nursing Home Regulations

In July 2019, CMS proposed sweeping changes to long-term care facility regulations, citing an interest in minimizing facilities' obligations.[96] Attorney General James submitted comments objecting to this proposal, urging CMS to prioritize resident well-being and facility accountability. Some of the regulations, especially a proposal to lessen infection control requirements, likely would have caused more resident morbidity and mortality had they been finalized before the COVID-19 pandemic. Some of the proposed changes that are most pertinent to the COVID-19 pandemic are described below.

***Reducing Infection Control Requirements:*** CMS's proposed regulations would change infection preventionists' required work duration from "at least part time" to "sufficient time … to meet the objective's [sic] set forth in the facility's [infection prevention and control program]."[97] CMS correctly noted in its proposal that infection is the leading cause of morbidity and mortality in nursing homes, yet still made this proposal to alleviate "excessive administrative burden."[98] The ongoing pandemic and mounting toll of COVID-19 resident deaths nationwide underscore the importance of more stringent infection control protections.

***Decreasing Frequency of Facility Assessments:*** The existing regulations require facilities to conduct an annual facility assessment to determine what resources are needed to care for residents in the ordinary course, and in emergencies. The 2019 proposed rule relaxes the current annual safety assessment requirement and replaces it with the need for the facility to conduct such assessments only biennially.[99] Decreasing the frequency of the assessment would allow safety hazards to go unnoticed, changes in staffing and resident populations to remain unconsidered, and evolving resident health acuity and morbidity to continue unaddressed.

**Reducing Requirements of Quality Improvement Programs:** CMS's 2019 proposed rules also remove most of the elements required for QAPI programs.[100] The effect of this is to render the proposed regulation too vague to be useful. CMS justifies deleting the QAPI required elements by stating, "the level of specificity and detail in the QAPI requirements... may limit a facility's ability to design their QAPI program to fit their individual needs."[101] However, the required QAPI elements are all broad and leave plenty of room for facility customization of their QAPI plans.

**Reducing Public Transparency:** Current CMS guidance is that facility compliance survey results should not be included in the Certification and Survey Provider Enhanced Reports (CASPER) system before the conclusion of any informal dispute resolution, which prevents the results from being incorporated in facilities' CMS Quality Measures rating. CMS proposes to incorporate this guidance as a new regulation.[102]

**Removing Residents' Rights-Medical Providers:** CMS proposed to only provide residents with their primary physician's name and contact information, removing the current requirement that facilities ensure residents remain informed of the names of all primary care professionals involved in their care.[103] The proposed change would make it difficult for patients to learn about and make changes to their broader medical team and services, and in some cases, effectively prevent them from exercising any control over their medical team and services.

**Removing Residents' Rights-Grievance Process:** The proposed regulations contain a provision that distinguishes between resident "feedback" and resident "grievances" and suggests different treatment for each, at the expense of residents' rights.[104] With facilities' power to determine the definition of a "grievance," they are also empowered to determine which complaints will undergo a full grievance investigation. This proposed change would likely result in a lack of accountability for facilities and a corresponding lack of support for residents.

**Decreasing Review of Anti-Psychotic Drug Prescriptions:** The proposed regulations remove the requirement that Pro re Nata (PRN or "as needed") prescriptions for anti-psychotic drugs can only be renewed after the physician re-evaluates the patient for the drug's continued appropriateness.[105] This proposal removes vital patient protections. Given the past abuse of these drugs as a means of physical control of residents and their potential danger, a close monitoring of anti-psychotic prescriptions must remain in place. Evidence shows that antipsychotics are associated with increased cerebrovascular morbidity and mortality among patients with dementia. Multiple government agencies and medical associations have taken notice of the overprescribing of antipsychotics to nursing home residents with dementia. Removing review requirements for anti-psychotic drug prescriptions places patients at health risk that might be further exacerbated during a pandemic.

# *Recommendations*

***Ensure public reporting by each nursing home as to the number of COVID-19 deaths of residents occurring at the facility — and those that occur during or after hospitalization of the residents — in a manner that avoids creating a double-counting of resident deaths at hospitals in reported state COVID-19 death statistics.***

As detailed in the report, discrepancies remain over the number of New York nursing home residents who died of COVID-19. Data obtained by OAG shows that DOH publicized data vastly undercounted these deaths. Ensuring standardized public reporting will alleviate these discrepancies and provide needed transparency.

***Enforce, without exception, New York state law requiring nursing homes to provide adequate care and treatment of nursing home residents during times of emergency.***

As detailed in the report, too many nursing home residents did not receive the adequate care and treatment to which they are entitled. While the COVID-19 pandemic put undue stress on many of our nation's systems, nursing homes must be prepared for these types of outbreaks.

***Require nursing homes to comply with labor practices that prevent nursing homes from pressuring employees to work while they have COVID-19 infection or symptoms, while ensuring nursing homes obtain and provide adequate staffing levels to care for residents' needs.***

There were too many instances of employees being pressured to work while contagious to ensure higher staffing levels. This put all residents and employees of the nursing home at risk. Employees should be encouraged to promptly report to DOH and OAG when owners or managers require, encourage, or knowingly permit staff to work when they are have a COVID-19 diagnosis or symptoms.

***Require direct care and supervision staffing levels that: (1) are expressed in ratios of residents to RNs, LPNs, and CNAs; (2) require calculation of sufficiency that includes adjustment based on average resident acuity; (3) are above the current level reflected at facilities with low CMS Staffing ratings; and, (4) are sufficient to care for the facility's residents' needs reflected in their care plans.***

Before considering any increases in Medicaid reimbursement rates to nursing homes, the state should require specified direct care and supervision staffing levels above the current level reflected at facilities with low CMS Staffing ratings and that are sufficient to care for residents' needs, and enact effective laws and regulations requiring nursing homes to provide complete disclosure of all monies transferred to related parties and the salaries, compensation, and distributions made to their owners, officers, directors and investors, and all loans made to and from any nursing home, and the repayment thereof.

Most states' standards include minimum levels for both total nursing hours and staffing levels in specific categories, without reference to the staffer's experience, familiarity with the residents or consistency of care. For example, the California standard is 3.2 hours per resident per day (HPRD) of total nursing care. Vermont requires 3 HPRD of total nursing care including an average of 2 HPRD of CNA care. Ohio requires average total care of at least 2.75 HPRD, including 0.2 HPRD of RN care and 2 HPRD of nurse aide care. Some states mix these requirements with other ratios (e.g., 1:15 staff to patient ratio) or include other staff hours (e.g., nutritionists, physical therapists). New Jersey recently enacted a minimum staffing law that requires, among other things, one CNA per eight residents (day shift); one direct caregiver per 10 residents (evening); one caregiver per 14 residents (night).

Changes in regulations regarding staffing should also address different categories of caregivers, each of which provide a different kind of care, and that accounts for the caregivers' experience and familiarity with the residents, on a 24/7 basis.

***Require additional and enforceable transparency in the operation of for-profit nursing homes, including financial transactions and financial relationships between nursing home operators and related parties, and relatives of all individual owners and officers of such entities with contractual or investor relationships with the nursing home. Through a variety of related party transactions and relationships, owners and investors of for-profit nursing homes can exert control over the facility's operations in a manner that extracts significant profit for them, while leaving the facility with insufficient staffing and resources to provide the care that residents deserve.***

Through a variety of related party transactions and relationships — including between owners, investors, corporate parents, landlords, purported management companies, consultants, vendors, service provider, charities and owner's family members,— owners and investors of for-profit nursing homes can exert control over the facility's operations in a manner that extracts significant profit for them, while leaving the facility with insufficient staffing and resources to provide the care that residents deserve.[106]

Before providing any supplemental funding to nursing homes, the state should require transparency, accountability and complete disclosure of the disposition of all funds received by the facilities. As a condition of payment of public funds to the nursing homes, the state should also require operators to execute monthly certifications affirming that staffing is sufficient to meet residents' needs.

***Ensure that nursing homes invest sufficiently in effective training so staff can fully comply with infection control protocols. Hold operators accountable for failures to have clinically appropriate policies in place and to effectively train staff to comply with them.***

Clearly, some facilities were not prepared to handle outbreaks through early and effective training or staffing. Rising COVID-19 infection rates in multiple areas of the state and a concerning number of nursing homes within those communities underscore the need for effective training in infection control protocols.

***Support manufacturing of PPE to facilitate sufficient supply of PPE for purchase by nursing homes. Enforce requirements that nursing homes have sufficient inventory of PPE for all staff to be able to follow infection control protocols.***

Many nursing homes severely lacked PPE for workers. In some instances, nursing home owners forewent infection control protocols, telling staff that masks and other PPE were not mandatory because they did not have enough supplies. In other cases, re-use of PPE may have contributed to the spread of infection. Nursing homes should be required to have a sufficient inventory of PPE in case of a future outbreak.

***Ensure that adequate COVID-19 testing is available to nursing home residents and employees and require nursing homes to test residents and staff in accordance with CDC and DOH evidence-based guidelines.***

Insufficient testing in the early days of the pandemic undoubtedly led to spread of COVID-19 by asymptomatic patients and staff. With regular testing for residents and employees, nursing homes will be much better able to contain future COVID-19 outbreaks.

***Eliminate the recently enacted immunity provisions that can provide financial incentives to for-profit nursing home operators to put residents at risk of harm by refraining from investing public funds to obtain sufficient staffing to meet residents' care needs, to purchase sufficient PPE for staff, and to provide effective training to staff to comply with infection control protocols during pandemics and other public health emergencies.***

The state's immunity laws were designed to provide necessary protection to frontline health care workers who placed their lives on the line during the pandemic, managers who are faced with impossible choices in caring for patients with COVID-19 in circumstances that are not of their own making, and facilities whose processes led to those decisions in good faith. These circumstances can include shortages of ventilators, respirators, medicine, other equipment, or available beds or services. As written, the immunity laws could be wrongly used to provide any individual or entity from liability, even if those decision were not made in good faith or motivated by financial incentives.

***Formally enact and continue to enforce regulatory requirements that nursing homes communicate with family members of residents promptly, but not later than within 24 hours, of any confirmed or suspected COVID-19 infection, and of any COVID-19 confirmed or suspected death.***

Too many facilities failed to appropriately communicate with families about COVID-19 infections and deaths. Existing requirements that nursing homes communicate with family members within 24 hours of COVID-19 infections and deaths must be enforced. Nursing homes should utilize technology, including their websites, to communicate efficiently with families in compliance with confidentiality laws regarding the presence of COVID-19 infection within the facility, as well as on updates on scheduling visitation. Additionally, nursing homes must ensure that only trained staff engage in complex and compassionate communications with families.

***Increase staffing at DOH to ensure sufficient skilled resources for oversight, complaint assessment, surveys, inspections and immediate responses to information requests from state agencies in support of health care and law enforcement efforts.***

DOH faced an unprecedented challenge: an agency staffed to visit each nursing facility once per year, under stable conditions, was called upon to visit nearly every facility in barely two months, under emergency conditions. In addition, the preliminary investigations indicate that facilities often misreported basic information to DOH. The agency's enforcement and referral programs should be strengthened through additional staff.

***Ensure that nursing homes engage in thoughtful planning regarding post-mortem care needs and implement and train staff on policies for dignified care of the remains of deceased residents.***

Facilities should have clear policies that set forth protocols for the dignified treatment of remains. Staff should be effectively trained on the facility's policies and protocols for dignified treatment of remains while they are onsite, including emergency situations; and, ensure timely communication between management and staff as to the facility's active implementation of these measures, including informing staff of pre-designated alternative morgue locations.

***Urge families to CMS Care Compare online database, ask questions of nursing homes relating to staffing, policies, procedures, and recent and current COVID-19 infections of staff and residents, and to obtain information relevant to their current or future long-term care decisions for their loved ones. Where possible, visit family member residents in person and through "window" visits and videocalls even if resident is unable to communicate, to provide emotional support and to enable observation of the resident's physical appearance and condition. Ensure family members know to report suspected neglect or abuse to DOH and OAG.***

Before deciding on a nursing home, families should consult CMS ratings, and be armed with the appropriate questions to ask potential facilities. Additionally, nursing homes should facilitate communication with family members, either through window visits, video calls, or phone calls so that family members can provide emotional support to their loved one and observe the conditions in the facility.

# Conclusion

This report provides an overview of OAG's preliminary investigative findings into the response by New York's nursing homes to the COVID-19 pandemic, and the heartbreaking reality that over 6,600 New Yorkers have died in nursing homes from complications related to COVID-19. OAG's investigations are ongoing. Attorney General James will continue to follow the facts, diligently and impartially, wherever they lead. In the meantime, given the ongoing COVID-19 pandemic and the risks to the state's estimated 90,000 nursing home residents as reflected by the data herein, systemic changes are warranted now. This report provides an overview of the recommended primary systemic reforms, as well as other measures that we believe will address the public's widely reported concerns about the pandemic's tragic impact on nursing home residents. As detailed in the report, nursing homes have a special obligation to the residents who depend upon the facility to meet every basic human need in what is for many, probably their last home. New York needs to ensure that nursing homes take care of our seniors and our most vulnerable residents with dignity, respect and the sufficient care that the law requires — and that the public primarily funds.

Attorney General Letitia James continues to encourage all residents, family members of residents and all caregivers to contact MFCU at (800) 771-7755 or at ag.ny.gov/nursinghomes if they believe that a patient in a residential health care facility has been neglected, abused, or mistreated.

# Acknowledgments & MFCU Mission Statement

New York State's Medicaid Fraud Control Unit (MFCU) is a bureau within the Criminal Justice Division of the Office of the Attorney General of the State of New York. The Division of Criminal Justice is led by Chief Deputy Attorney General for Criminal Justice José Maldonado and overseen by First Deputy Jennifer Levy. MFCU's mission is to protect the public from all forms of fraud against the Medicaid program and to protect the state's vulnerable nursing home residents from exploitation, neglect, and abuse by unscrupulous providers. MFCU investigates and brings criminal prosecutions and civil actions to stop Medicaid provider fraud, to protect vulnerable residents, and to protect Medicaid program integrity.

This report is the collective product of investigative work undertaken since March 2020 by MFCU's 275 attorneys, forensic auditors, police investigators, medical analysts, data scientists, electronic investigation team, legal assistants, and support staff in eight offices across New York.

MFCU receives 75 percent of its funding from the U.S. Department of Health and Human Services under a grant award totaling $60,071,905 for Federal fiscal year (FY) 2019-20, of which $45,053,932 is federally funded. The remaining 25 percent of the approved grant, totaling $15,017,973 for FY 2019-20, is funded by New York state. Through MFCU's recoveries by means of law enforcement actions and civil enforcement actions, it regularly returns more to the state than it receives in state funding.

# APPENDIX A (referenced on p. 9)

## Table of Key Federal and State Guidance

| Date | Federal | New York |
|------|---------|----------|
| 1/21/20 | CDC confirmed and announced the first case of COVID-19.<br><br>cdc.gov/media/releases/2020/p0121-novel-coronavirus-travel-case.html | |
| 1/31/20 | HHS Secretary declared a public health emergency for the US, giving state, tribal, and local health departments flexibility to request HHS authorization to temporarily reassign personnel to respond to COVID-19.<br><br>hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html | |
| 2/6/20 | | DOH issued a letter to nursing homes and hospitals, asking "all facilities to compare their existing inventories of PPE, such as face shields, gowns, gloves, masks, N95 respirators, against the expected rate of use of these items under a surge situation, to determine the quantities needed to be on hand" and then to coordinate with existing vendors and local offices of emergency management to procure additional PPE.<br><br>coronavirus.health.ny.gov/system/files/documents/2020/03/2020-02-06_ppe_shortage_dal.pdf |
| 2/7/20 | CDC's Morbidity and Mortality Weekly Report stated, "CDC is working closely with state and local health partners to develop and disseminate information to the public on general prevention of respiratory illness, including [COVID-19]. This includes everyday preventive actions such as washing your hands, covering your cough, and staying home when you are ill," and referred readers to CDC's website. It noted, "[t]hese measures are being implemented based on the assumption that there will be more U.S. [COVID-19] cases occurring with potential chains of transmission, with the understanding that these measures might not prevent the eventual establishment of ongoing, widespread transmission of the virus in the [U.S.]. It is important for public health agencies, health care providers, and the public to be aware of [COVID-19] so that coordinated, timely, and effective actions can help prevent additional cases or poor health outcomes."[107]<br><br>cdc.gov/mmwr/volumes/69/wr/mm6905e1.htm | |

| | |
|---|---|
| 3/4/20 | **CMS published to State Survey Agencies a Guidance for Infection Control and Prevention of COVID-19 in Nursing Homes**, with information on (1) screening and, if necessary, restricting visitors to nursing homes; (2) screening and, if necessary, restricting employees with signs or symptoms of COVID-19 from working in the facility; (3) when to transfer residents to the hospital; and, (4) when a nursing home should accept a resident diagnosed with COVID-19 from the hospital. It stated that "a nursing home can accept a patient with a COVID-19 diagnosis who is still under Transmission-Based Precautions "as long as it can follow CDC guidance for [T-BP]. If a nursing home cannot, it must wait until precautions are discontinued." (See Transmission-Based Precautions Guidance from CDC.) The CMS guidance stated that nursing homes should admit any individuals that they would normally admit, including from hospitals where a case of COVID-19 was present.<br><br>cms.gov/medicareprovider-enrollment-and-certificationsurveycertificationgeninfopolicy-and/qso-20-14-nh.pdf | |
| 3/4/20 | CMS published guidance to State Survey Agency Directors on, among other things, discharging patients with COVID-19 diagnoses to subsequent care facilities. CMS instructed that the decision to discharge a patient transfer should be based on clinical considerations of the patient, and that if T-BP must be continued, the receiving facility must be able to implement all recommended infection prevention and control recommendations. Medicare hospital planning required all medically necessary information, including communicable diseases, be provided to post-acute care providers for COVID-19, prior to discharge.<br><br>cms.gov/files/document/qso-20-13-hospitalspdf.pdf-2 | |

| 3/7/20 | CDC issued "Interim U.S. Guidance for Risk Assessment and Public Health Management of Healthcare Personnel (HCP) with Potential Exposure in a Healthcare Setting." The guidance states that "contact tracing, monitoring, and work restrictions. . . includ[ing] allowances for asymptomatic HCP who have had an exposure to a COVID-19 patient to continue to work after options to improve staffing have been exhausted and in consultation with their occupational health program." It stated that asymptomatic staff exposed to COVID-19 were "not restricted from work."<br><br>fluxguard.com/coronavirus/site/331dd37e-f2af-4323-9424-0e0cc4dee8aa/session/9cf5a974-73a6-4fcf-a397-9d68cf59342d/page/a0400044-4df1-47b2-ae8d-f318b3c27c5c/txtview?actionId=6564a241-1186-4b51-8185-9cc4da76263f&captureId=1583805385934 | Governor Cuomo declared a Disaster Emergency due to COVID-19, state that a "disaster is impending in New York State, for which the affected local governments are unable to respond adequately."<br><br>Executive Order 202<br><br>governor.ny.gov/news/no-202-declaring-disaster-emergency-state-new-york |

| | | |
|---|---|---|
| 3/11/20 | | DOH issued guidance to nursing home owners/ operators and administrators regarding "precautions and procedures nursing homes must take to protect and maintain the health and safety of their residents and staff during" the COVID-19 outbreak. The guidance noted that it was essential that all nursing home owner/ operators, administrators, and clinical staff maintain situational awareness about the disease, its signs and symptoms, and necessary infection prevention and control procedures and review the most up-to-date information for health care providers. The guidance still permitted visitation but required screening of visitors and recommended modified hours. It also required employee screening and that staff showing symptoms "not be permitted to remain at work" and "not return to work until completely recovered."  It required 14-day voluntary or mandatory quarantine for an asymptomatic staff person who had potential exposure to COVID-19 following the exposure.  It required a mandatory 14-day quarantine for symptomatic staff following the date of onset of symptoms. It provided information on conserving PPE, but specifically instructed that facilities' controls should not discourage the use of masks when indicated for patient care. It emphasized the need to reinforce infection control regulations at 10 NYCRR § 415.19 and noted that residents suspected of infection with COVID-19 should be given a surgical or procedure mask (not an N95) and that while awaiting the transfer, the resident must be isolated in a separate room with the door closed.<br><br>DOH also (1) restricted visitation in nursing homes; (2) provided information on conserving PPE but specifically instructed that facilities' controls should not discourage the use of masks when indicated for patient care; and, (3) set forth practices to prevent the spread of COVID-19. It described the symptoms of COVID-19 and conveyed the obligation and need to often check for updates on CDC, and DOH Health Commerce System websites for situational awareness, symptoms, and infection control. It emphasized the need to reinforce infection control regulations 10 NYCRR § 415.19 and noted that residents suspected of infection with COVID-19 should be given a surgical or procedure mask (not an N95) and that while awaiting the transfer, the resident must be isolated in a separate room with the door closed.<br><br>coronavirus.health.ny.gov/system/files/ documents/2020/03/nursing_home_guidance.pdf |

| 3/13/20 | | | **DOH issued updated COVID-19 Health Advisory Guidance** to nursing homes and adult care facilities suspending all visitation, except where it was medically necessary or for imminent end-of-life situations.[108] The advisory also required facilities to immediately implement health checks for all HCP before each shift and require that all HCP wear a facemask while within six feet of residents. If there were confirmed cases of COVID-19, the advisory required nursing homes and adult care facilities to (1) notify the local health department and DOH if not already involved; (2) monitor all residents on affected shifts; (3) assure that all residents in affected units remained in their rooms to the extent possible; (4) require residents to wear facemasks when HCP entered their rooms, unless resident could not tolerate facemasks; (5) preclude "floating" staff between units, minimize staff entering rooms, and cohort positive residents with dedicated providers; (6) place residents on affected units on "droplet and contact precautions"; and, (7) required re-testing immediately residents who initially tested negative, if they developed symptoms consistent with COVID-19. If there were suspected cases of COVID-19, residents were to be given a facemask and isolated in a separate room with the door closed. The advisory required that staff should wear full PPE and maintain social distancing of at least six feet from resident except for "brief, necessary interaction."<br><br>coronavirus.health.ny.gov/system/files/documents/2020/03/acfguidance.pdf |

| 3/16/20 | CDC issued updated guidance on time tables for HCP with confirmed or suspected COVID-19 to return to work, instructing officials to use one of two strategies. Under the "test-based strategy," CDC advised that HCP should be excluded from work until (1) resolution of fever without the use of medication; (2) improvement in respiratory symptoms; and, (3) after at least two negative test results taken at least 24 hours apart. Under the "non-test-based strategy," CDC advised that symptomatic HCP should be excluded from work until (1) "at least 3 days (72 hours) have passed since recovery (defined as resolution of fever without the use of medication), (2) "improvement of respiratory symptoms," and (3) "at least 7 days have passed since symptoms first appeared." It acknowledged that appropriate state and local authorities "might determine that the recommended approaches cannot be followed due to the need to mitigate HCP staffing shortages."<br><br>phdmc.org/program-documents/healthy-lifestyles/gumc/emergency/covid-19/physicians-healthcare-providers/1449-return-to-work-criteria-for-healthcare-workers/file | DOH issued updated guidance advising that "facilities may allow HCP exposed to or recovering from [COVID-19]" to work if:<br><br>• Furloughing such staff would result in shortages that adversely impact the operation of the facility;<br><br>• HCP who had contact with confirmed or suspected cases are asymptomatic;<br><br>• Symptomatic HCP with confirmed or suspected COVID-19 isolated for at least 7 days after illness onset and were fever-free at least 72 hours with other symptoms improving.<br><br>• HCP who were asymptomatic after contact with confirmed or suspected cases were directed to self-monitor twice a day (temperature, symptoms), and undergo temperature monitoring and symptom checks at the beginning of each shift and at least every 12 hours.<br><br>• Staff who recovered from COVID-19 were directed to wear a facemask until 14 days after onset of illness if mild symptoms persisted but were improving.<br><br>• Staff who were asymptomatic after contact were directed to wear a facemask while working until 14 days after the last high-risk exposure.<br><br>Staff working under these conditions were to be assigned to patients at lower risk (on COVID-19 units) as opposed to severely immunocompromised or elderly patients. If staff developed symptoms, they were directed to immediately stop work and isolate at home.<br><br>Testing was prioritized for hospitalized health care workers.<br><br>All staff with symptoms consistent with COVID-19 were assume they were COVID-19 positive regardless of the availability of test results.<br><br>nyshfa-nyscal.org/files/2020/03/Advisory-HCP-return-to-work-20200316-final.pdf |

| Date | | |
|---|---|---|
| 3/18/20 | | Executive Order 202.5 allowed transfer to Article 28 facilities and suspended regulations:<br><br>• 10 NYCRR § 400.12 to the extent necessary to allow patients affected by the disaster emergency to be transferred to receiving Article 28 facilities;<br><br>• 10 NYCRR § 415.15 to the extent necessary to permit facilities receiving individuals affected by the disaster emergency to obtain physician approvals for admission as soon as practicable or to forego such approval for returning residents; and,<br><br>• 10 NYCRR § 415.26 to the extent necessary to permit facilities receiving individuals affected by the disaster emergency to comply with admission procedures as soon as practicable after admission or to forego such approval for returning residents.<br><br>governor.ny.gov/news/no-2025-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency |
| 3/21/20 | | DOH issued guidance with different testing protocols for facilities within New York City, Long Island, Westchester, and Rockland Counties – which had "sustained community transmission" of COVID-19 – and for facilities located in the rest of the state. It stated that in the nine downstate counties, "testing of residents and [HCPs] with suspect COVID-19 is no longer necessary and should not delay additional infection control actions" for any resident with symptoms of a febrile respiratory illness, and that such residents should be presumed to be COVID-19 positive. Facilities outside of these nine counties "should continue to pursue testing for residents and health care workers with suspect COVID-19 to inform control strategies." coronavirus.health. ny.gov/system/files/documents/2020/03/22-doh_covid19_nh_alf_ilitest_032120.pdf |
| 3/23/20 | CDC published Transmission-Based Precautions (T-BP) and Disposition of Patients with COVID-19 in Healthcare Settings (Interim Guidance) stating that "a patient can be discharged from the healthcare facility whenever clinically indicated: If discharged to a long-term care or assisted living facility," and T-BP were still required, the patients "should go to a facility with an ability to adhere to infection prevention and control recommendations for the care of residents with COVID-19." The guidance indicated that preferably, the patient would be placed in a location "designated to care for COVID-19 residents." If T-BP had been discontinued, the patient does not require further restrictions, based upon their history of COVID-19 infection.<br><br>hsdl.org/?view&did=836726 | Executive Order 202.10 included specified immunity for health care providers, including from civil liability for any injury or death alleged to have been sustained directly as a result of an act or omission by such medical professional in the course of providing medical services in support of the state's response to the COVID-19 outbreak, unless it is established that such injury or death was caused by the gross negligence of such medical professional. The executive order relieved health care providers of certain record keeping requirements to the extent necessary for them to perform tasks as necessary to respond to the COVID-19 outbreak and provided them immunity from liability for failure to comply with recordkeeping requirements if they acted reasonably and in good faith.<br><br>governor.ny.gov/news/no-20210-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency |

| | | |
|---|---|---|
| 3/25/20 | | DOH issued guidance to nursing home administrators, directors of nursing and hospital discharge planners stating, "No resident shall be denied re-admission or admission to the nursing home solely based on a confirmed or suspected diagnosis of COVID-19. NHs are prohibited from requiring a hospitalized resident who is determined medically stable to be tested for COVID-19 prior to admission or re-admission." It also provided information on how to request PPE from DOH. (On May 26, DOH removed this guidance from its website.) <br><br> skillednursingnews.com/wp-content/ uploads/sites/4/2020/03/DOH_COVID19__ NHAdmissionsReadmissions__032520_1585166684475_0. pdf |
| 3/31/20 | | DOH issued guidance on April 1, dated March 31, entitled "Protocols for Essential Personnel to Return to Work Following COVID-19 Exposure or Infection." <br><br> coronavirus.health.ny.gov/system/ files/documents/2020/04/doh_covid19_ essentialpersonnelreturntowork_rev2_033120.pdf |
| 4/3/20 | HHS-Office of Inspector General issued "Hospital Experiences Responding to the COVID-19 Pandemic: Results of a National Pulse Survey March 23–27, 2020," OEI-06-20-00300, noting CDC delay in producing COVID-19 test, and hospital reports of need for PPE, testing, staffing, supplies and equipment, delays waiting for test results and challenges maintaining or expanding their facilities' capacity to treat patients with COVID-19.[109] <br><br> oig.hhs.gov/oei/reports/oei-06-20-00300.asp | |
| 4/6/20 | | The Emergency Disaster Treatment Protection Act was enacted to "promote the public health, safety and welfare of all citizens by broadly protecting the health care facilities and health care professionals in this state from liability that may result from treatment of individuals with COVID-19 under conditions resulting from circumstances associated with the public health emergency." PHL § 3080. (See Section VI(G) above for the statute's text.) <br><br> nysenate.gov/legislation/laws/PBH/A30-D |

| | | |
|---|---|---|
| 4/13/20 | CDC issued updated guidance entitled "Return to Work for Healthcare Personnel with Confirmed or Suspected COVID-19" to express a preference for the test-based strategy for HCP to return to work, if feasible, yet still accepted the non-test based model. According to the guidance, asymptomatic staff who tested positive COVID-19 "should be excluded from work until 10 days after the date of their first positive COVID-19 diagnostic test" if they have remained asymptomatic throughout that time.<br><br>web.archive.org/web/20200417191400/https://www.cdc.gov/coronavirus/2019-ncov/hcp/return-to-work.html | |
| 4/16/20 | | Executive Order 202.18 required nursing homes to notify family members within 24 hours of a resident COVID-19 diagnosis or death.<br><br>governor.ny.gov/news/no-20218-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency |
| 4/17/20 | | Executive Order 202.19 directed DOH to establish "a single, statewide coordinated testing prioritization process" that required all laboratories in the state, both public and private, to coordinate with the DOH and prioritize COVID-19 testing.<br><br>governor.ny.gov/news/no-20219-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency |
| 4/29/20 | | DOH issued a letter to nursing home administrators stating that the state would no longer adhere to CDC's "shorter" standard on HCP returning to work as set forth in CDC's interim guidance. DOH required that a nursing home HCP who tested positive for COVID-19 but remains "asymptomatic" not return to work "for 14 days from [the] first positive test date in any situation." It stated, "symptomatic nursing home employees may not return to work until 14 days after the onset of symptoms, provided at least 3 days (72 hours) have passed since resolution of fever without the use of fever-reducing medications and respiratory symptoms are improving." It invited "nursing homes facing staffing difficulties" to use DOH's online staffing portal, noting 200 facilities used it as of April 29.<br><br>coronavirus.health.ny.gov/system/files/documents/2020/05/nh-letterregardingemployees-4.29.20.pdf |

| | | |
|---|---|---|
| 5/10/20 | | Executive Order 202.30 required nursing homes to make arrangements for COVID-19 testing of all personnel twice per week and report any positive test to DOH the next day. It also required the operator and the administrator of each home to provide to DOH a certification of compliance with the Executive Order and "directives of the Commissioner of Health." <br><br> governor.ny.gov/news/no-20230-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency |
| 6/10/20 | | Executive Order 202.40 continued the directives of EO 202.30 yet modified them to require nursing homes to make arrangements for COVID-19 testing of all employees, contract staff, medical staff, operators and administrators once per week for all nursing homes and all adult care facilities that are located in regions that have reached Phase Two of New York state's reopening plan. |
| 6/17/20 | | Public Health Law § 2803(12) requires residential health facilities to submit to DOH an annual "Pandemic Emergency Plan" by 9/15/20. <br><br> nysenate.gov/legislation/laws/PBH/2803#:~:text=(a)%20The%20commissioner%20shall%20have,including%20health%2Drelated%20service%2C%20system |

# APPENDIX B

## An Illustration of the Too Prevalent "Low Staffing for Profit" Model of Exploitation Through Insufficient Staffing, Lack of Transparency, and Financial Incentives: a Pre-Pandemic OAG Investigation, Findings, and Prosecution

The 2018 investigation described below is relevant to the COVID-19 pandemic because the operating model for staffing that led to systemic abuse and neglect at this facility remains prevalent in too much of the for-profit sector of the nursing home industry in New York. Of the state's 619 total nursing homes, 401, or 61 percent, are for-profit entities. The chronic staffing failures caused neglect throughout the facility even without a severe external strain such as COVID-19.

Most nursing homes operate on a model that essentially seeks 100 percent resident capacity at the facility every day, because billing and insurance payments are per-day, per-patient. Each empty bed is lost potential revenue. Conversely, from too many facilities' perspectives, each additional resident does not require additional staffing if the time and labor of the staff already on-duty can be stretched and shifted to assign coverage for the care needs of the patients. Every facility has some financial incentive to avoid hiring additional staff, because each staffer's pay, and benefits (if any), are an expense. However, if a nursing home stretches that staffing model to assign employees to cover the care needs for too many residents – with insufficient numbers of appropriate employees – the model snaps.

## 1. OAG Pre-Pandemic Investigation of Focus at Otsego Nursing Home

OAG conducted an investigation of allegations of neglect of residents in Focus Rehabilitation and Nursing Center at Otsego (Focus), a 174-bed nursing home in Cooperstown, New York, after a number of earlier incidents that resulted in arrests of several health care workers for offenses including neglect of residents and falsification of medical records to conceal neglect. In one incident of neglect, a 94-year old resident was left in a recliner in a common living room area of the facility for approximately 41 hours during a holiday weekend without appropriate care, treatment, or service. The investigation included an inquiry into systemic causes of neglect of Focus residents. To obtain the facts that resulted in the investigative findings, OAG conducted extensive forensic accounting investigation and detailed analysis of medical and staffing records relating to the Focus nursing home. This work was required to bring transparency to what happened to millions of Medicaid reimbursement dollars that went through many financial transactions from the facility to related parties. (See Appendix B at B-1, Funding Flow Through chart). It also included significant investigation and analysis of records of staffing levels.

## 2. Findings: Chronic Insufficient Staffing Increased Resident Neglect and Harm; Lack of Transparency in Profit-taking

The findings of this investigation included that the owners and management of Focus cut staffing at the facility in late 2014 in order to increase their personal profit, through a variety of financial transactions with related parties.[110] The cuts in staffing at Focus resulted in:

&raquo; Neglect and injury to residents of the facility;

&raquo; Increased risk of injury to residents of the facility;

&raquo; Very challenging working conditions for the direct care staff whose responsibilities included providing care for the residents in accordance with their plans of care;

&raquo; Resignations of direct care staff members in frustration after unsuccessful warnings to owners and management that the insufficient staffing levels created risks for the residents and untenable working conditions;

&raquo; Refusals by the operator, 99 percent owner, and manager to increase the facilities' budget and reverse insufficient staffing levels at Focus;

&raquo; Use of staff from a "temporary agency staffing" company owned by a party to the defendant manager, in lieu of hiring full time staff; and,

&raquo; Failure to maintain staff even at the level deemed "critical" by other licensed managers.

Routine reliance on temporary agency staff in lieu of full-time employees to fill budgeted staffing levels resulted in staffing that met fewer residents' care needs. Agency staff, who are sent to any nearby facility to work any shift on any assignment within the facility, are usually less familiar with each of the resident's care needs, facility protocols, facility resources, medical professional resources, and therefore, less effective in delivering care. Agency staff must often familiarize themselves with each resident's chart and care plan in order to provide appropriate care. Agency staff also often have less familiarity with facility policies, operations, and personnel, which can result in the need for more time to complete work.[111]

## 3. Prosecution, Convictions, and Civil Remedies

**Prosecution**:  Based on relevant aspects of these findings, in May 2018, OAG filed criminal charges against the entity that held the operator's license for, and controlled, Focus, an individual who was the 99 percent owner of Focus, and an individual who was the owner's business partner in other ventures while acting as a high level manager for Focus, for their conduct between October 14, 2014 to December 31, 2017. The charges included three felony counts of Endangering the Welfare of an Incompetent or Physically Disabled Person in the First Degree, in violation of Penal Law § 260.25, a Class E felony: one count as to all residents of the facility from October 14, 2014 to November 29, 2016, and two counts as to two specific residents who each suffered injury. The charges against each defendant also included two misdemeanor counts of Endangering the Welfare of an Incompetent or Physically Disabled Person in the Second Degree in violation of Penal Law § 260.24 ("Misdemeanor Endangering") as: one count as to all  residents of the home from May 26, 2016 to November 29, 2016, and one count as to a specific resident from May 28, 2016 to June 1, 2016; and, two misdemeanor counts of Willful Violation of Health Laws, in violation of Public Health Law §§ 12-b(2), 2803-d(7), and 10 NYCRR §§ 81.1, 415.11 and 415.12(c)(2): one count for the neglect of all the residents of the home from May 26, 2016 to November 29, 2016, and one count for the neglect of a specific resident from May 28 to 30, 2016.

**Convictions and Assurance of Discontinuance:** In September 2018, the corporate operator's 99 percent owner and its manager both pleaded guilty to misdemeanor Endangering, and also entered a civil Assurance of Discontinuance under Executive Law § 63(15) in which they agreed to repay $1 million to the New York State Medicaid program, and to be voluntarily excluded from Medicaid and from operating health care businesses in New York state for 5 years. The corporate operator pleaded guilty to felony Endangering and was dissolved. Absent OAG's investigation, findings, prosecution, and civil remedy of an Assurance of Discontinuance, it is most likely that the owner, manager, and Focus corporate operator would have been operating the Focus nursing home during the COVID-19 pandemic with levels of staffing that were insufficient to meet the pre-pandemic needs of the residents for care and services. Fortunately, this result and its predictable negative outcomes were prevented.

## 4. Law Enforcement Resource Investment

Conducting the investigation regarding the Focus nursing home noted above, and reflected in part in Appendix B-1, required a significant amount of OAG resources and expertise. Many law enforcement agencies lack the resources to conduct such comprehensive investigations of the financial transactions and records that identify and address what can be a root cause of incidents of neglect – i.e., insufficient staffing.[112] A more efficient way to address the problem of chronic insufficient levels of staffing in for-profit nursing homes is to require effective minimum staffing levels and transparency in financial relationships with all related parties.
(See Recommendations D and E in Section VIII)

## 5. Similar Findings Regarding Lack of Transparency in Operation of Some For-Profit Nursing Homes

News organizations and advocacy groups have published findings about the ways in which too many for-profit nursing homes operate – specifically by extracting money from the facility and transferring it to investors, owners and related parties through divided ownership interests, mortgages, leases,[113] contracts and arrangements for services, such as management services, agency staffing, rehabilitation services, laundry and food services. Against the backdrop of lack of transparency regarding the related party financial transactions, members of the for-profit nursing home industry have claimed government reimbursement rates are "too low." As shown in the chart attached hereto as Appendix B-1, self-dealing obscures the true net revenue of such operations. Such transactions create a balance sheet that may suggest the facility is running even or at a loss, when in fact the owners are taking out profits as "fees", salaries for low-activity positions, or revenue to affiliated businesses.[114] The question whether reimbursement rates should be increased to enable for-profit nursing homes to provide care they are obligated to provide cannot be answered without full transparency into the facilities' mortgages, leases, management and "consulting" companies, contracts and arrangements for services.

### Appendix B-1

### Related Party Transactions at a Nursing Home

October 2014 - December 2017 Funds Directly Paid to Related Parties



## Appendix B-2





# Endnotes

[1] The investigation was conducted by the Medicaid Fraud Unit (MFCU), a federally funded, multi-disciplinary unit within the OAG that serves a dual mission to investigate Medicaid provider fraud and the abuse and neglect of patients in residential health care facilities, and bring civil and/or criminal remedies to address wrongdoing.

[2] All dates are in the year 2020 unless otherwise specified.

[3] This was following an Executive Order issued by Governor Andrew Cuomo relating to communications between nursing homes and family members.

[4] On September 3, CMS launched Care Compare, a redesign of eight existing CMS health care compare tools that were available on Medicare.gov, including Nursing Home Compare, which previously contained CMS's ratings for each nursing home in the four categories of Overall, Staffing, Infection Control and Quality of Care. medicare.gov/care-compare

[5] The legislature enacted, and the governor signed, amendments to Public Health Law §§ 3081-82 effective August 3, limiting the scope of immunity to acts relating to the "diagnosis or treatment of COVID-19" or "the assessment or care of an individual as it relates to COVID-19, when such individual has a confirmed or suspected case of COVID-19," and eliminating a clause concerning care of any other individuals. However, the potential defenses as to resources or staffing shortages were not amended.

[6] hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html

[7] CDC issued guidance for uniform reporting of COVID-19 vital health statistics: deaths of people whose laboratory tests resulted in a COVID-19 positive diagnosis and where COVID-19 played a role in the death should be reported as "confirmed" COVID-19 deaths. The guidance also provides that where a definite COVID-19 diagnosis cannot be made but is suspected or likely given the circumstances, a COVID-19 death may be reported as "presumed." cdc.gov/nchs/data/nvss/vsrg/vsrg03-508.pdf

[8] health.ny.gov/statistics/diseases/covid-19/fatalities_nursing_home_acf.pdf

[9] "New York Coronavirus Map and Case Count," *The New York Times*, nytimes.com/interactive/2020/us/new-york-coronavirus-cases.html

[10] Bronx, Kings, Nassau, New York, Queens, Richmond, Rockland, Suffolk, and Westchester counties.

[11]As of August 3, nursing home deaths due to COVID-19 were reported in 40 counties: Albany, Bronx, Broome, Chenango, Columbia, Dutchess, Erie, Fulton, Greene, Herkimer, Kings, Livingston, Madison, Monroe, Montgomery, Nassau, New York, Niagara, Oneida, Onondaga, Ontario, Orange, Orleans, Putnam, Queens, Rensselaer, Richmond, Rockland, Schenectady, Steuben, Suffolk, Sullivan, Tioga, Ulster, Warren, Washington, Wayne, Westchester, Wyoming, and Yates.

[12]The data has not yet been verified against other data sources.

[13]The DOH data used for 58 of the 62 facilities was the data published on the date that matched the end of the timeframe of the data reported by each facility to OAG, or if DOH had not published data on that day, the data published on the following date.  For four facilities reporting data to OAG for a timeframe ending prior to May 3, the DOH data published as of that date was used. This is because the data DOH published before May 3 for those facilities reflected no or few deaths, whereas the data DOH published as of May 3 reflected an increase in deaths at those facilities and was expressly stated as including presumed and confirmed COVID19 deaths.

[14]Through July 16, DOH reported one confirmed death at the facility, and as of July 30, DOH reported 11 confirmed deaths at the facility.

[15]At the same time, to the extent that the discrepancy results from the omission in DOH published data of resident deaths that occurred in hospitals, the under-counting of nursing home resident COVID-19 deaths does not reflect under-counting of total NYS COVID-19 deaths.

[16]The New York State Cemetery Board issued emergency crematory regulations adopted by the New York State Cemetery Board on May 1, 2020 that permitted funeral homes to transfer deceased awaiting cremation to crematories with ready capacity. With this change, for which Attorney General James advocated and her designee to the Cemetery Board voted, funeral directors, with the consent of the family of the deceased, have been able avoid significant delays by manually correcting cremation authorization forms rather than needing to create a new form and obtain another physical signature from the person arranging the funeral.

[17]Meaghan. McGoldrick, "Staffers say that bodies at Brooklyn nursing home are 'piling up'," *amny*, April 14, 2020

[18]"Coronavirus Deaths: Officials Told 'Bodies Being Piled Up In Nursing Homes' As Desperate Families Face Silence," CBS New York, April 14, 2020

[19]OAG's hotline reflected instances where residents' families were contacted by, or were only able to contact, nursing home employees unprepared to deliver such news, without the training, knowledge, and expertise to provide the appropriate end of life communications usually performed by experienced licensed nurses and social workers. In others, upon making inquiry as to their loved ones' mortal health risks, families were told that authorized persons were unreachable due to personal religious observances or days off and that their call would have to wait.

[20] The analysis focuses on the data through August 3, because this was the period of the first wave, when infection and death rates were concentrated downstate.

[21] 10 NYCRR § 415.19.

[22] Failure to have robust infection prevention and control policies could constitute resident neglect for failing "to provide timely, consistent, safe, adequate and appropriate services, treatment, and/or care to a patient or resident of a residential health care facility." 10 NYCRR § 81.1(c). "Willful" neglect is a misdemeanor punishable by imprisonment not exceeding one year, a $10,000 fine or both. Public Health Law § 12-b(2).

[23] DAL NH 20-04 COVID-19 Guidance for Nursing Homes – Revised, Mar 11, 2020, coronavirus.health.ny.gov/system/files/documents/2020/03/nursing_home_guidance.pdf

[24] Information for Healthcare Facilities Concerning 2019 Novel Coronavirus Illness (2019-nCOV), Feb 6, 2020. cms.gov/medicareprovider-enrollment-and-certificationsurveycertificationgeninfopolicy-and-memos-states-and/information-healthcare-facilities-concerning-2019-novel-coronavirus-illness-2019-ncov

[25] Coronavirus Disease 2019 (COVID-19) Preparedness Checklist for Nursing Homes and other Long-Term Care Settings, Mar 13, 2020, cdc.gov/coronavirus/2019-ncov/downloads/novel-coronavirus-2019-Nursing-Homes-Preparedness-Checklist_3_13.pdf

[26] New York nursing homes are required to have a written "disaster and emergency preparedness" plan, updated at least twice a year, with procedures to be followed for the proper care of residents and personnel in the event of "an internal or external emergency resulting from natural or man-made causes." 10 NYCRR § 415.26(f).

[27] Aspiration precautions are taken for residents at high risk of choking during self-feeding, with a staff member staying nearby to watch.

[28] health.ny.gov/facilities/nursing/about_nursing_home_reports.htm#comdefrr

[29] DOH spearheaded 1,300 onsite infection control inspections, including of every nursing home and adult care facility, and initiated its own administrative enforcement actions against a number of nursing homes for violations of infection control protocols, of HERDS data reporting requirements, and of Executive Order 202.18 communication requirements.

[30] OAG continues to receive complaints of neglect of residents that occurred during the pandemic in New York.

[31] Some staff reassignment was permissible under emergency COVID "scope of practice waivers" issued by DOH, such as shifting clerical or food service staffers to work as CNAs. Those emergency waivers were to offset the already-critical staffing crisis, not new employment opportunities.

[32]*Nursing Home and ACF COVID Related Deaths Statewide* (web-published daily by NYS DOH), accessed daily, using data published through 11/16/20. The published data notes, "This data captures COVID-19 confirmed and COVID-19 presumed deaths within nursing homes and adult care facilities. This data does not reflect COVID-19 confirmed or COVID-19 presumed positive deaths that occurred outside of the facility. Retrospective data reporting dates back to March 1, 2020."

[33]This analysis utilized the CMS quarterly metrics from June. Although CMS waived certain reporting requirements in 2020 at various times and held certain data points constant, there is no reason to believe that staffing and outcomes improved during the waiver periods. CMS has stated that it will resume calculating nursing homes Health Inspection and Quality Measure ratings on January 27, 2021.

[34]As noted in DOH Revised Report (7/20/20) and consistent with OAG analysis, this drop is despite the location of most CMS 5-Star Overall rated facilities in the hardest-hit counties.

[35]OAG continues to explore the anomalous rate shown by CMS 5-Star Staffing and 2-Star Overall rated facilities. There are few facilities in this group, and perhaps other poor practices result in little net difference from the COVID-19 death rate for a CMS 1-Star Staffing and 1-Star Overall rating combination. (There are no data points for CMS 1-Star Staffing and 4- or 5-Star Overall rated facilities, as the CMS methodology does not permit those combinations.)

[36]medicare.gov/nursinghomecompare/search.html

[37]skillednursingnews.com/2018/11/new-york-officials-call-greater-scrutiny-non-profit-nursing-home-sales

[38]DOH Revised Report 7/20/20 at pp. 23-24.

[39]OAG also accounted for a sample that ensured that at least one facility at each star level was in the county.

[40]The New York State Office of Emergency Management (OEM) is an office within the division of the NYS Division of Homeland Security and Emergency Services (DHSES).

[41]Executive Order 202.40, issued June 10, 20, continued this testing requirement yet modified it to a once a week testing requirement for nursing homes in areas in the second phase of the State's multi-tiered reopening plan.

[42]This approach of placing to onus on staff to obtain testing is less likely to result in staff being tested because many staff Statewide have low salaries and lack health insurance.

[43]DOH, Advisory: Hospital Discharges and Admissions to Nursing Homes, March 25, 2020

[44]DOH Revised Report at pp. 4-5.

[45]While some commentators have suggested DOH's March 25 guidance was a directive that nursing homes accept COVID-19 patients even if they could not care appropriately for them, such an interpretation would violate statutes and regulations that place obligations on nursing homes to care for residents. For example, New York law requires a nursing home to "accept and retain only those residents for whom it can provide adequate care." See 10 NYCRR § 415.26(i)(1)(ii). Preliminary findings show a number of nursing homes implemented the March 25 guidance with understanding of this fundamental assessment.

[46]U.S. Dep't of Health and Human Services Office of the Inspector General, "Hospital Experiences Responding to the COVID-19 Pandemic: Results of a National Pulse Survey March 23–27, 2020," OEI-06-20-00300 dated April 2020. The HHS-OIG report's key findings included hospitals reporting that "their most significant challenges centered on testing and caring for patients with known or suspected COVID-19 and keeping staff safe." Hospitals also reported challenges maintaining or expanding their facilities' capacity to treat patients with COVID-19, and frequently waiting seven days or longer for COVID-19 test results. Hospitals reported that as "patient stays were extended while awaiting test results, this strained bed availability, [PPE], supplies, and staffing." In addition, "acute care capacity concerns emerged as hospitals anticipated being overwhelmed if they experienced a surge of patients" who may require special beds and rooms to treat and contain infections.

[47]ibid.

[48]ibid.

[49]See DOH Revised Report at 25.

[50]See DOH Revised Report at 19-20.

[51]See DOH Revised Report at 16.

[52]PHL § 3080

[53]Though amendments were enacted to Public Health Law §§ 3081-82 effective August 3, limiting the scope of immunity to acts relating to the "diagnosis or treatment of COVID-19" or "the assessment or care of an individual as it relates to COVID-19, when such individual has a confirmed or suspected case of COVID-19," and eliminating a clause concerning care of any other individuals,  the potential defenses as to resources or staffing shortages were not amended.

[54]Public Health Law § 3082.

[55]ibid.

[56]Very few nursing home residents are completely "self-pay," without some form of private or public insurance.

[57]Notably, OAG investigations have revealed different structures and power balances between licensed administrators and owners in other for-profit facilities, compared to the above example. NYS Nursing Home regulations do not mention "owners" as part of the admissions process. 10 NYCRR § 415.26(i).

[58]10 NYCRR § 415.1(1)(a)(1).

[59]10 NYCRR § 415.1(1)(a)(5)

[60]10 NYCRR § 415.12

[61]10 NYCRR § 415.26(i)(1)(ii)

[62]10 NYCRR § 415.13

[63]10 NYCRR § 415.11(c)

[64]10 NYCRR § 415.3(a)

[65]10 NYCRR § 415.2(f)

[66]42 C.F.R. § 483.1.

[67]42 C.F.R. § 483.24

[68]42 C.F.R. § 483.25 ("Based on the comprehensive assessment of a resident, the facility must ensure that residents receive treatment and care in accordance with professional standards of practice, the comprehensive person-centered care plan, and the resident's choices…").

[69]42 C.F.R. § 483.10; *See also* 42 U.S.C. § 1396r; 42 U.S.C. § 1395i-3.

[70]42 C.F.R. § 483.10; 42 U.S.C. § 1396r; 42 U.S.C. § 1395i-3.

[71]42 C.F.R. § 483.12.

[72]42 C.F.R. § 483.25.

[73]42 C.F.R. § 483.20; 42 C.F.R. § 483.21; *See also* 42 C.F.R. § 483.21; 42 U.S.C. § 1396r; 42 U.S.C. § 1395i-3.

[74]42 C.F.R. § 483.21; 42 U.S.C. § 1396r; 42 U.S.C. § 1395i-3.

[75]42 C.F.R. § 483.24.

[76]ibid.

[77]ibid.

[78] 42 C.F.R. § 483.30; 42 U.S.C. § 1396r; 42 U.S.C. § 1395i-3.

[79] 42 C.F.R. § 483.35; *See also,* 42 U.S.C. § 1395i-3.

[80] 42 C.F.R. § 483.60; *See also,* 42 U.S.C. § 1395i-3.

[81] 42 C.F.R. § 483.50; 42 C.F.R. § 483.55; *See also* 42 U.S.C. § 1396r; 42 U.S.C. § 1395i-3.

[82] 42 C.F.R. § 483.40; *See also,* 42 U.S.C. § 1395i-3.

[83] 42 C.F.R. § 483.70; *See also,* 42 U.S.C. § 1395i-3.

[84] ibid.

[85] ibid.

[86] 42 C.F.R. § 483.75; 42 U.S.C. § 1396r; 42 U.S.C. § 1395i-3.

[87] 42 C.F.R. § 483.85.

[88] 42 C.F.R. § 483.70(e).

[89] 42 C.F.R. § 483.73. *See also* 10 NYCRR § 415.26(f).

[90] ibid.

[91] 42 C.F.R. § 483.80; *See also* 42 U.S.C. § 1396r; 42 U.S.C. § 1395i-3.

[92] 42 C.F.R. § 483.80.

[93] ibid.

[94] Medicare and Medicaid Programs, Basic Health Program, and Exchanges; Additional Policy and Regulatory Revisions in Response to the COVID-19 Public Health Emergency and Delay of Certain Reporting Requirements for the Skilled Nursing Facility Quality Reporting Program, 85 FR 27550-01. The additional requirements include the reporting of COVID-19 information, including deaths, suspected and confirmed infections, PPE supply, ventilator supply; access to testing; and staffing shortages to CDC on at least a weekly basis. The changes also include a requirement for facilities to inform residents and their families each time there has been a confirmed infection of COVID-19, or when three or more residents or staff display newly-onset respiratory symptoms within 72 hours of each other. They must inform residents and their families and representatives of such occurrence by 5pm the next calendar day and must provide cumulative updates at least weekly. 42 C.F.R. § 483.80(g).

[95] 42 C.F.R. § 483.70(n).

[96] Medicare and Medicaid Programs, 84 Fed. Reg. 138 at 34737.

[97] ibid.

[98] Medicare and Medicaid Programs, 84 Fed. Reg. 138 at 34747, 34746.

[99] Medicare and Medicaid Programs, 84 Fed. Reg. 138 at 34738, 34745.

[100] Medicare and Medicaid Programs, 84 Fed. Reg. 138 at 34748, 34745-6.

[101] Medicare and Medicaid Programs, 84 Fed. Reg. 138 at 34745.

[102] Medicare and Medicaid Programs, 84 Fed. Reg. 138 at 34749-50. These survey reports are the product of required state surveys of facilities that seek to assess compliance with statutes and regulations that facilities have notice of and are required to follow. Permitting facilities to wait to upload the data onto the CASPER system until a pending dispute resolution process has concluded would deprive residents and consumers of vital information that is accurate and relevant to their healthcare decisions, including which facility to reside in, or entrust a loved one to.

[103] Medicare and Medicaid Programs, 84 Fed. Reg. 138 at 34740.

[104] Medicare and Medicaid Programs, 84 Fed. Reg. 138 at 34737, 34740-41.

[105] Medicare and Medicaid Programs, 84 Fed. Reg. 138 at 34738, 34743-4.

[106] *See* Sections VI(A), (B), and (G), and Appendix B, B-1, and B-2.

[107] Patel A, Jernigan DB. Initial Public Health Response and Interim Clinical Guidance for the 2019 Novel Coronavirus Outbreak — United States, December 31, 2019–February 4, 2020. MMWR Morb Mortal Wkly Rep 2020;69:140–146. DOI: cdc.gov/mmwr/volumes/69/wr/mm6905e1.htm

[108] DOH issued new guidance effective September 17, 2020 that permitted nursing homes that have been without COVID-19 infection for at least 14 days to resume limited visitation under restrictions designed to keep residents safe from infections of COVID-19. This was a revision to the 28-day guidelines previously set by CMS, which also issued guidance regarding the 14-day period following any COVID-19 infection in the facility.

[109] The HHS-OIG report was issued on April 3 by Principal Deputy Inspector General of HHS OIG Christi A. Grimm, who was also serving as Acting Inspector General of HHS-OIG at the time. The President reportedly sought to remove Grimm from the latter position after he expressed displeasure on April 6 at the report's findings. On May 26, Acting Inspector General Grimm testified before Congress, emphasizing "the importance of independent oversight from the nation's watchdogs." pbs.org/newshour/politics/watch-live-hhs-watchdog-testifies-on-trump-administrations-response-to-covid-19

[110]For the purpose of this discussion, "related party" means entities controlled by the owners or controlled by other individuals who have family relationships or joint ownership of other business ventures with the facility owners.

[111]Among guidance issued in March, CDC noted that agency staffers, working in multiple location, are higher risk as disease vectors. "Facilities should identify staff that work at multiple facilities (*e.g.,* agency staff, regional or corporate staff, etc.) and actively screen and restrict them appropriately to ensure they do not place individuals in the facility at risk for COVID-19." CDC, *Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes (REVISED)*, March 13, 2020.

[112]In order to enable OAG to investigate the financial transactions, related-party relationships and staffing levels in all of the facilities where insufficient staffing may be a root cause of neglect, MFCU's funding would need to be increased by over 300 percent. Such a budget increase is not one of this report's recommendations. It would be far more efficient to address the identified problem by implementing the recommendations of requiring mandatory, sufficient, defined staffing and supervision levels and more transparency in transactions between nursing homes, related parties and investors.

[113]*See, e.g.,* media reports such as projects.newsday.com/long-island/coronavirus-cold-spring-hills-nursing-home

[114]Such practices also have tax implications.

## Attorney General James Releases Report on Nursing Homes' Response to COVID-19

*Investigations Reveal DOH Publicly Reported Data Undercounted COVID-19 Deaths and Many Nursing Homes Failed to Comply with Critical Infection Control Policies*

*AG Conducting Ongoing Investigations into More Than 20 Facilities*

NEW YORK – Attorney General Letitia James today **released a report on her office's ongoing investigations into nursing homes' responses to the COVID-19 pandemic**. Since March, Attorney General James has been investigating nursing homes throughout New York state based on allegations of patient neglect and other concerning conduct that may have jeopardized the health and safety of residents and employees.

Among those findings were that a larger number of nursing home residents died from COVID-19 than the New York State Department of Health's (DOH) published nursing home data reflected and may have been undercounted by as much as 50 percent. The investigations also revealed that nursing homes' lack of compliance with infection control protocols put residents at increased risk of harm, and facilities that had lower pre-pandemic staffing ratings had higher COVID-19 fatality rates. Based on these findings and subsequent investigation, Attorney General James is conducting ongoing investigations into more than 20 nursing homes whose reported conduct during the first wave of the pandemic presented particular concern.

"As the pandemic and our investigations continue, it is imperative that we understand why the residents of nursing homes in New York unnecessarily suffered at such an alarming rate," said **Attorney General James**. "While we cannot bring back the individuals we lost to this crisis, this report seeks to offer transparency that the public deserves and to spur increased action to protect our most vulnerable residents. Nursing homes residents and workers deserve to live and work in safe environments, and I will continue to work hard to safeguard this basic right during this precarious time."

**Background**

The Office of the Attorney General (OAG) is the only law enforcement agency in the state specifically mandated to investigate and prosecute abuse and neglect of residents in nursing homes. In early March, OAG received and began to investigate allegations and indications of COVID-19-related neglect of residents in nursing homes. At the direction of Governor Andrew Cuomo, on April 23, OAG set up a hotline to receive complaints relating to communications by nursing homes with family members prohibited from in-person visits to nursing homes and formally initiated a large-scale investigation of nursing homes' responses to the pandemic. OAG received more than 770 complaints on the hotline

through August 3, and an additional 179 complaints through November 16. OAG also continued to receive allegations of COVID-19-related neglect of residents through pre-existing reporting systems.

**Overview of Findings**

The report includes preliminary findings based on data obtained in investigations conducted to date, recommendations that are based on those findings, related findings in pre-pandemic investigations of nursing homes, and other available data and analysis. Based on this information and subsequent investigation, OAG is currently conducting investigations into more than 20 nursing homes across the state. OAG found that:

> A larger number of nursing home residents died from COVID-19 than DOH data reflected;

> Lack of compliance with infection control protocols put residents at increased risk of harm;

> Nursing homes that entered the pandemic with low U.S. Centers for Medicaid and Medicare Services (CMS) Staffing ratings had higher COVID-19 fatality rates;

> Insufficient personal protective equipment (PPE) for nursing home staff put residents at increased risk of harm;

> Insufficient COVID-19 testing for residents and staff in the early stages of the pandemic put residents at increased risk of harm;

> The current state reimbursement model for nursing homes gives a financial incentive to owners of for-profit nursing homes to transfer funds to related parties (ultimately increasing their own profit) instead of investing in higher levels of staffing and PPE;

> Lack of nursing home compliance with the executive order requiring communication with family members caused avoidable pain and distress; and

> Government guidance requiring the admission of COVID-19 patients into nursing homes may have put residents at increased risk of harm in some facilities and may have obscured the data available to assess that risk.

*Undercounting of COVID-19 Deaths in Nursing Homes*

Preliminary data obtained by OAG suggests that many nursing home residents died from COVID-19 in hospitals after being transferred from their nursing homes, which is not reflected in DOH's published total nursing home death data. Preliminary data also reflects apparent underreporting to DOH by some nursing homes of resident deaths occurring in nursing homes. In fact, the OAG found that nursing home resident deaths appear to be undercounted by DOH by approximately 50 percent.

OAG asked 62 nursing homes (10 percent of the total facilities in New York) for information about on-site and in-hospital deaths from COVID-19. Using the data from these 62 nursing homes, OAG compared: (1) in-facility deaths reported to OAG compared to in-facility deaths publicized by DOH, and (2) total deaths reported to OAG compared to total deaths publicized by DOH.

In one example, a facility reported five confirmed and six presumed COVID-19 deaths at the facility as of August 3 to DOH. However, the facility reported to OAG a total of 27 COVID-19 deaths at the facility and 13 hospital deaths — a discrepancy of 29 deaths.

### *Lack of Compliance with Infection Control Policies*

OAG received numerous complaints that some nursing homes failed to implement proper infection controls to prevent or mitigate the transmission of COVID-19 to vulnerable residents. Among those reports were allegations that several nursing homes around the state failed to plan and take proper infection control measures, including:

- Failing to properly isolate residents who tested positive for COVID-19;

- Failing to adequately screen or test employees for COVID-19;

- Demanding that sick employees continue to work and care for residents or face retaliation or termination;

- Failing to train employees in infection control protocols; and

- Failing to obtain, fit, and train caregivers with PPE.

For instance, OAG received a complaint that at a for-profit nursing home located north of New York City, residents who tested positive for COVID-19 were intermingled with the general population for several months because the facility had not yet created a "COVID-19 only" unit. At another for-profit facility on Long Island, COVID-19 patients who were transferred to the facility after a hospital stay and were supposed to be placed in a separate COVID-19 unit in the nursing home were, in fact, scattered throughout the facility despite available beds in the COVID-19 unit. This situation was allegedly resolved only after someone at the facility learned of an impending DOH infection control visit scheduled for the next day, before which those residents were hurriedly transferred to the appropriate designated unit.

OAG received reports that nursing homes did not properly screen staff members before allowing them to enter the facility to work with residents. Among those reports, OAG received an allegation that a for-profit nursing home north of New York City failed to consistently conduct COVID-19 employee screening. It was reported that some staff avoided having their temperatures taken and answering a COVID-19 questionnaire at times when the screening station at the facility's front entrance had no employees present to take that information or when staff entered the facility through a back entrance, avoiding the screening station altogether.

At yet another facility in Western New York, a nurse reported to OAG that immediately prior to the facility's first DOH inspection in late April, a nurse supervisor had set up bins in front of the units with gowns and N95 masks to make it appear that the facility had an adequate supply of appropriate PPE for staff. The nurse alleged that the nurse supervisor came in to work unusually early the day of the first inspection and brought out all new PPE and collected all of the used gowns. Although the initial DOH survey conducted that day did not result in negative findings, DOH returned to the facility for follow-up inspections, issued the facility several citations, and ultimately placed the facility in "Immediate Jeopardy."

### *Nursing Home with Low Staffing Ratings Had Higher Fatality Rates*

There are 619 nursing homes in New York, and 401 of these facilities are for-profit, privately owned, and operated entities. Of the state's 401 for-profit facilities, more than two-thirds — 280 nursing homes — have the lowest possible CMS Staffing ratings. The Staffing rating reflects the number of staffing hours in the nursing department of a facility relative to the number of residents. As of November 16, 3,487 COVID-19 resident deaths (over half of all deaths) occurred in these 280 facilities. Some of these facilities have also been known to transfer facility funds to owners and investors, rather than use them to invest in additional staffing to care for residents.

Pre-existing, insufficient staffing levels put residents and staff at increased risk of harm during the pandemic. As nursing home resident and staff COVID-19 infections rose during the initial wave of the pandemic, staffing absences increased at many nursing homes. As a result, already-low staffing levels decreased even further, to especially dangerous levels in some homes, even as the need for care increased due to the need to comply with COVID-19 infection control protocols and the loss of assistance from family visitors. OAG's preliminary investigations reflect many examples where for-profit nursing homes' pre-pandemic low staffing model simply snapped under the stress of the pandemic.

OAG received a complaint from a resident's son about a for-profit nursing home in New York City alleging that his mother was not receiving proper care because of critically low staffing levels at the facility. His mother was never tested for COVID-19, but later died while exhibiting COVID-19 symptoms. Between late March and early April, the facility was so understaffed due to staff quarantining, working from home, and pre-existing low staffing, that the onsite management of the entire facility was left in the hands of just two nurse supervisors. During the week of April 5, 33 residents died at that facility, 15 percent of all its residents.

In addition, preliminary investigations indicate that when there were insufficient staff to care for residents, some nursing homes pressured, knowingly permitted, or incentivized existing employees who were ill or met quarantine criteria to report to work and even work multiple consecutive shifts, in violation of infection control protocols. These policies put both residents and staff at great risk.

**Immunity Provisions**

Despite these disturbing and potentially unlawful findings, due to recent changes in state law, it remains unclear to what extent facilities or individuals can be held accountable if found to have failed to appropriately protect the residents in their care.

On March 23, Governor Cuomo created limited immunity provisions for health care providers relating to COVID-19. The Emergency Disaster Treatment Protection Act (EDTPA) provides immunity to health care professionals from potential liability arising from certain decisions, actions and/or omissions related to the care of individuals during the COVID-19 pandemic. While it is reasonable to provide some protections for health care workers making impossible health care decisions in good faith during an unprecedented public health crisis, it would not be appropriate or just for nursing homes owners to interpret this action as providing blanket immunity for causing harm to residents.

In order to ensure no one can evade potential accountability, Attorney General James recommends eliminating these newly enacted immunity provisions.

Attorney General James encourages anyone with information or concerns about nursing home conditions to file **confidential complaints online** or by calling 833-249-8499.

This report is the collective product of investigative work undertaken since March 2020 by the Medicaid Fraud Control Unit's (MFCU) 275 attorneys, forensic auditors, police investigators, medical analysts, data scientists, electronic investigation team, legal assistants, and support staff in eight offices across New York. MFCU is led by Director Amy Held and Assistant Deputy Attorney General Paul J. Mahoney. MFCU is a part of the Division for Criminal Justice, which is led by Chief Deputy Attorney General for Criminal Justice José Maldonado and overseen by First Deputy Attorney General Jennifer Levy.

MFCU receives 75 percent of its funding from the U.S. Department of Health and Human Services under a grant award totaling $60,071,905 for Federal fiscal year (FY) 2019-20, of which $45,053,932 is federally funded. The remaining 25 percent of the approved grant, totaling $15,017,973 for FY 2019-20, is funded by New York state. Through MFCU's recoveries by means of law enforcement actions and civil enforcement actions, it regularly returns more to the state than it receives in state funding.

## Translate This Page

Select Language ⌄

Powered by  **Translate**

Translation Disclaimer

# Previous Press Releases

- January 2021
- December 2020
- November 2020
- October 2020
- September 2020
- August 2020
- July 2020
- June 2020
- May 2020
- April 2020
- March 2020
- February 2020
- January 2020
- December 2019
- November 2019
- October 2019
- September 2019
- August 2019
- July 2019
- June 2019
- May 2019
- April 2019
- March 2019
- February 2019
- January 2019

Visit the Press Release Archive

**Search:**

Please enter a search term...